Joseph JASPAN, Michael Carbone, Jack Dee, Robert Sasso, Alfred Finkel, Theodore King, Chester Broman and John Quadrozzi as Trustees of the Local 282 Pension Trust Fund, Plaintiffs,

v.

CERTIFIED INDUSTRIES, INC., IIJ Enterprises, Inc., IIJ Associates and Split Rock Realty, Inc., Defendants.

No. CV 84–2561.

United States District Court, E.D. New York.

Oct. 23, 1985.

Cohen, Weiss and Simon, New York City, for plaintiffs; Jani K. Rachelson, of counsel.

Sloan & Luks, New York City, for defendants; Allan Sloan, of counsel.

*Memorandum of Decision and Order*
MISHLER, District Judge.

The Trustees of the Local 282 Pension Trust Fund, as plan sponsors, instituted this action for the assessment of the sum of $1,166,865 together with interest, attorney's fees and costs, claiming that amount from defendants as the withdrawal liability of Certified Industries, Inc. ("Certified"), a contributor to the multiemployer plan, based on the termination of all covered operations under the collective bargaining agreement as of June 30, 1981. (Amended Complaint).

Defendants moved to stay the proceedings pending arbitration pursuant to 29 U.S.C. § 1401(a)(1). Plaintiffs moved for summary judgment for the relief demanded in the complaint and dismissing the defend-

ants' counterclaim. The counterclaim alleges a violation of the trustees' fiduciary duty "in fixing the benefits to be received by the participants in the Pension Trust Fund in consideration of the level of contributions that were made." (Answer p. 25). Apparently the defendants say that if benefits were fixed based on appropriate "actuarial assumptions and investment return assumptions," defendants would not be burdened by "the alleged withdrawal liability." [1]

### FACTS

The following facts are either conceded or not disputed:

Local 282 Pension Trust Fund ("Fund") is a multiemployer pension plan within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1002(2) and (37). Certified Industries, Inc. is a New York corporation with its principal place of business at 211 East 46th Street, New York, New York. Defendants IIJ Enterprises, Inc., Split Rock Realty, Inc. and IIJ Associates (a partnership) have their place of business at the same address. [2]

Prior to June 30, 1981, Certified was a party to a collective bargaining agreement with Local 282, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America ("Local 282"). The agreement obligated Certified to make regular contributions to the Fund. It provided that in the event of sale of the employer's "entire operation," the purchaser

... shall continue to be subject to the terms and conditions of this agreement for the life thereof.... The Employer shall give notice of the existence of this agreement to any potential successor ... No transaction ... shall become effective unless and until the Union has been notified in writing by the Employer and the

successor that the successor has agreed to assume the obligations of the Agreement.

On or about November 25, 1980, Certified entered into a contract to sell all its assets to Marine Pollution Service, Inc. ("Marine"). The contract provided for the assumption by Marine of Certified's obligations under its collective bargaining agreement with Local 282.

On June 30, 1981, Certified transferred all its assets to Marine pursuant to the contract of sale. Thereafter, Marine made contributions to the Fund for substantially the same contribution base units on which Certified contributed prior to June 30, 1981.

By letter dated December 13, 1982, the Fund notified Certified that it had withdrawn from the Fund on June 30, 1981, and that it might have incurred a withdrawal liability under ERISA. The letter further advised Certified that the Fund would notify it of the amount of the liability, if any, and of the payment schedule, at which time Certified would have the right, within 90 days of receipt of the notice, to (1) seek review by the trustees; (2) identify any inaccuracy in arriving at the amount claimed; and (3) furnish any additional relevant material.

By letter dated February 9, 1983, received by Certified on February 14, 1983, the Fund advised Certified that its withdrawal liability was in the amount of $1,167,555, payable in monthly installments of $38,299.83, commencing March 1, 1983, and continuing through December, 1985, with a final payment of $4,000.20 due in January, 1986. The letter again advised Certified of its opportunity within 90 days of receipt of the letter to seek adjustment or correction of the amount claimed, as was noted in the letter of December 13, 1982. It also directed Certified's attention to the

1. The answer asserts seven affirmative defenses, i.e., statute of limitations, estoppel, unconstitutionality of the provisions assessing withdrawal liability, exemption from withdrawal liability since "the Pension Trust Fund covers employees employed exclusively in the construction and building industry." (29 U.S.C. § 1383(b)).

2. The complaint alleges that all the "Defendants' operations are interrelated with common management and common ownership and/or financial control of their assets." (Complaint, par. 6).

employer's right to arbitrate any dispute of the Fund's claim pursuant to Section 4221(a)(1) of the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1401(a)(1).

When Certified failed to make payment of the first installment due on March 1, 1983, the Fund sent a letter to Certified on March 2, (received on March 4) advising Certified that payment of the March installment was overdue and further that failure to make a payment within 60 days from the date of receipt of the letter would constitute a default upon which the entire amount would be due as provided under Section 4219(c)(5)(A) of the MPPAA, 29 U.S.C. § 1399(c)(5)(A).[3] A second demand for the March installment was mailed on March 18, (received by Certified on March 21). On April 4, 1983, the Fund notified Certified that it had not received the payment due on April 1. The letter contained all the advice included in the letter advising Certified of the March payment. As with the March, 1983 notice of installment due, the Fund advised Certified of the failure to make the payment due on April 1, by follow-up letter dated April 19. A similar notice and follow-up letter was mailed for the May 1983 payment. All the letters were received by Certified within two or three days of mailing. The form letters sent each month for the months of February 1983 to May 1983 contained the following:

... A change in the amount of the total withdrawal liability will not affect the amount of the monthly payment due; it will affect the duration of those payments only.

On June 31, 1983, the Fund advised Certified that the amount of withdrawal liabili-

ty had been reduced by $821.81 thereby reducing the final payment (due January 1986) from $4,000.20 to $3,178.39.

On August 23, 1983, counsel for Certified (counsel stated that he was retained by Split Rock/IIJ Enterprises) wrote the Fund a letter challenging the assessment based on Section 4203(b) of the MPPAA, 29 U.S.C. § 1383(b) which provides an exemption for the building and construction industry.[4]

On September 1, 1983, the Fund, by counsel, advised counsel for Certified that the Fund "does not primarily cover employees in the building and construction industry...."

By letter of September 23, 1983, Certified's counsel advised the Fund's attorney that Marine had contributed to the Fund subsequent to June 30, 1981 in "substantially the same base units as did Certified." The letter offered to secure a bond issued by a corporate surety company to guarantee the payment of contributions to the plan for a period of five plan years as required under Section 4204(a)(1)(B) of the MPPAA, 29 U.S.C. § 1384(a)(1)(B). The letter also claimed that the statutory period for challenging the withdrawal liability should be computed from June 30, 1983 and not from February 14, 1983, (the date of receipt of the Fund's letter of February 9, 1983 assessing liability and demanding payment). The Fund's attorney rejected Certified's position in a letter dated November 28, 1983. The original complaint was filed on June 12, 1984 for judgment in accordance with the demand of February 9, 1983, together with attorney's fees and costs pursuant to Section 502(g) of ERISA, 29 U.S.C. § 1132(g).[5]

---

**3.** Plaintiff's letter refers to the relevant section as MPPAA § 4219(c)(iii)(5), but there is no such section in the statute. The default provision referred to is in § 4219(c)(5), 29 U.S.C. § 1399(c)(5), however, we find any resulting defect in the notice to be de minimis.

**4.** 29 U.S.C. § 1383(b) excepts from the withdrawal obligation, based on the termination of the obligation of the employer to contribute, where (A) substantially all the employees with respect to whom the employer has an obligation

to contribute under the plan perform work in the building and construction industry....
  (B) the plan
  (i) primarily covers employees in the building and construction industry.

**5.** A proposed amended complaint was filed on July 19, 1985 substituting the trustees of the Fund as plaintiffs for Joseph Jaspan and Albert B. Lewis as Fund Manager and Asset Manager appointed pursuant to this court's order of December 7, 1983, and for judgment in the amount

## DISCUSSION

■ The history and purpose of the MPPAA is reported in *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 2713–15, 81 L.Ed.2d 601 (1984) (upholding the constitutionality of the retroactive application of the withdrawal provisions). *See also T.I.M. E.-DC, Inc. v. Management-Labor Welfare & Pension Funds, etc.*, 756 F.2d 939, 943–44 (2d Cir.1985). It is sufficient to note that one of the purposes of the MPPAA "was to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Pension Benefit Guaranty Corp. (PBGC), supra*, 467 U.S. at 720, 104 S.Ct. at 2713. The nature of the statutory liability of a withdrawing employer from a multiemployer pension plan is to "pay a fixed and certain debt to the pension plan." 467 U.S. at 725, 104 S.Ct. at 2715. *See Trustees of Retirement Fund v. Lazar-Wisotzky, Inc.*, 550 F.Supp. 35 (S.D.N.Y.1982), *affirmed by summary order*, 738 F.2d 419 (2d Cir.1984) ("the Act imposes strict liability upon employers who discontinue contributions to a multiemployer plan, and ... it, in effect, creates an account stated in the amount the withdrawing employer has been notified it must pay as calculated by the plan's actuary").

"The Act forces an employer that withdraws from a plan to pay its share of the benefits that have accrued to plan participants and for which the plan continues to be liable. By placing the funding burden on the withdrawing employer, the Act relieves the PBGC of the potentially crippling burden of paying out inordinate amounts of insurance. It also reduces an employer's incentive to withdraw from the plan to escape paying for vested benefits that its employees have earned, but that the employer has not yet funded." *T.I.M.E.-DC, supra*, 756 F.2d at 944.

■ The withdrawal liability is the withdrawing employer's proportionate share of the Fund's "unfunded vested benefits," 29 U.S.C. § 1381(b)(1). The term "unfunded vested benefits" is defined as "an amount equal to—(A) the value of nonforfeitable benefits under the plan, less (B) the value of the assets of the plan." *Id.* § 1393(c); *Republic Industries v. Central Pa. Teamsters*, 693 F.2d 290, 292 (3rd Cir.1982). The withdrawal provisions "are a rational means of allocating among a group of employers the collective burden of insuring that their employees receive full compensation." *Washington Star Co. v. International Typographical Union Negotiated Pension Plan*, 729 F.2d 1502, 1510 (D.C. Cir.1984). The trustees of the Fund have the obligation of determining the amount of withdrawal liability, notifying the employer of the amount and collecting the amount from the employer. 29 U.S.C. § 1382; *Republic Industries, supra*, 693 F.2d at 292. Notice served on the withdrawing employer imposes a duty to pay in accordance with the schedule of payments separate and apart from the right of the employer to seek review under 29 U.S.C. § 1399(b)(2)(A).[6] In the event arbitration is

---

of $1,166,865 with interest at the rate of 11%. The complaint is amended and the answer filed on July 2, 1984 is deemed an answer to the amended complaint. The caption shall reflect *the trustees of the Fund as plaintiffs.*

6. 29 U.S.C. § 1399(b) provides:
　(b) Notification, demand for payment, and review upon complete or partial withdrawal by employer. (1) As soon as practicable after an employer's complete or partial withdrawal, the plan sponsor shall—
　　(A) notify the employer of—
　　(i) the amount of the liability, and
　　(ii) the schedule for liability payments, and

　(B) demand payment in accordance with the schedule.
　(2)(A) No later than 90 days after the employer receives the notice described in paragraph (1), the employer—
　　(i) may ask the plan sponsor to review any specific matter relating to the determination of the employer's liability and the schedule of payments,
　　(ii) may identify any inaccuracy in the determination of the amount of the unfunded vested benefits allocable to the employer, and
　　(iii) may furnish any additional relevant information to the plan sponsor.

demanded such payments are not suspended. *Id.* § 1401(d).

■ The legislative history clearly reveals the Congressional purpose in enacting the MPPAA. "The primary purpose of the legislation is to protect retirees and workers who are participants in such plans against loss of their pensions." H.R.Rep. No. 96–869, Part I 96th Cong., 2d Sess. 51, *reprinted in* 1980 U.S.Code Cong. & Ad. News 2918, 2919. The statute created a withdrawal liability "to relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers.... Employer withdrawal liability will help to insulate a plan from the adverse effects of a sustained decline in the contribution base." *Id.* at 67, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 2935. The report shows Congressional intent to require the trustees to determine the amount of withdrawal liability; to notify the employer of the assessment and demand payment in accordance with the schedule of payments. *Id.* at 83, *reprinted in* U.S. Code Cong. & Ad.News at 2951. Congress intended that the trustees' notice to the employer fix an absolute liability subject only to the limited right to review under § 1399(b) and the right to arbitrate. The exercise of these rights does not suspend the employer's obligation to pay in accordance with the schedule of payments.

The court in *T.I.M.E.–DC, supra,* observed: "The employer is still liable for payment during the review and appeal period." 756 F.2d at 947. "Payments of withdrawal liability would begin no later than 60 days after the date on which demand for payment is made by the plan sponsor.... Litigation instituted by an employer to contest the liability would not suspend the running of the 60–day period." H.R. No. 96–869, *supra,* at 84, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 2952.

■ The procedure which vests in the plan trustees the authority to determine withdrawal liability, subject only to the limited right of the employer to question the determination under § 1399(b)(2)(A), and the compulsory arbitration procedure under § 1401, have both withstood constitutional challenge. *Textile Workers Pension Fund v. Standard Dye and Finishing Co.,* 725 F.2d 843, 854–55 (2d Cir.1984), ("When Congress creates a new cause of action and remedies unknown to the common law, it may vest fact finding in a tribunal other than a jury.") *Washington Star, supra,* 729 F.2d at 1511; *Republic Industries, Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund,* 718 F.2d 628, 640–41 (4th Cir.1983); *Contra Keith Fulton & Sons, Inc. v. New England Teamsters and Trucking Industry Pension Fund, Inc.,* 762 F.2d 1124, 1135, 1137 (1st Cir.1984).

■ Certified's motion to stay this litigation pending arbitration must be denied. After receiving notice from the Fund on February 14, 1983, of the amount of the withdrawal liability and the schedule of payments, Certified had 90 days to request review from the trustees. 29 U.S.C. § 1399(b)(2)(A). Certified made no response to the demand until its letter of August 23, 1983, well beyond the 90 day limit. The time to initiate arbitration is measured either from the date the plan sponsor receives a timely request to review its determination, § 1401(a)(1)(B), or from the date of the plan sponsor's response to the request for review, § 1401(a)(1)(A). Since no timely request for review was made, Certified has waived its right to demand arbitration. *See Board of Trustees of the Western Conference of Teamsters v. Ceazan,* 559 F.Supp. 1210, 1218 (N.D.Cal. 1983).

■ Section 1401(a) also makes provision for the parties' joint initiation of arbitration. This must occur within 180 days of

(B) After a reasonable review of any matter raised, the plan sponsor shall notify the employer of—
  (i) the plan sponsor's decision,

(ii) the basis for the decision, and
(iii) the reason for any change in the determination of the employer's liability or schedule of liability payments.

the plan sponsor's demand. It is difficult to construe Certified's letters of objection and the Fund's responses thereto, as the joint initiation of arbitration, but even if we do so, it can be of no avail to Certified, since more than 180 days had elapsed between the demand letter of February 9 and August 23, the date of Certified's earliest response.

*The Cross Motion for Summary Judgment*

The trustees have cross-moved for summary judgment on the grounds that as a matter of law the withdrawal liability amount demanded is due and owing and defendants cannot assert any defenses thereto.

The trustees have sustained their initial burden of establishing that there are no genuine issues of fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1319 (2d Cir.1975). Defendants have not shown that a genuine issue is presented. Defendants may not rest on conclusory allegations. *S.E.C. v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978). "[T]he mere possibility that a factual dispute *may* exist, without more, is not sufficient to overcome a convincing presentation by a moving party.... Rather, he must bring to the court's attention some affirmative indication that his version of the relevant events is not fanciful." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980).

Section 1401(b)(1) provides:

If no arbitration proceeding has been initiated pursuant to subsection (a), the amounts demanded by the plan sponsor under section 4219(b)(1) [29 U.S.C. § 1399(b)(1) ] *shall be due and owing on the schedule set forth by the plan sponsor.* The plan sponsor may bring an action in a State or Federal court of competent jurisdiction for collection. (emphasis added).

As we have found that arbitration has not been timely initiated, Certified's liability has become fixed. *See Sova Outerwear Corp. v. Trustees of the Amalgamated Cotton Garment and Allied Industries Fund*, 578 F.Supp. 1126, 1127 (S.D.N.Y. 1984); *Ceazan, supra*, 559 F.Supp. at 1218. The amounts demanded are thus "due and owing" and the trustees are entitled to bring an action for collection. 29 U.S.C. § 1401(b).

Of course, Certified could have avoided the withdrawal liability if, when it transferred all its assets on June 30, 1981, it made sure that the provisions of section 1384 were complied with. This section provides that in the event of a bona fide sale of assets to an unrelated party the seller can avoid withdrawal liability if: (1) the purchaser has an obligation to contribute to the plan for substantially the same contribution base units as seller, (2) the purchaser posts a bond to secure the liability of the seller, and (3) the seller agrees in the contract of sale to remain secondarily liable for the withdrawal liability if the buyer fails to perform. 29 U.S.C. § 1384(a).

It appears that the purchaser, Marine, has continued making the appropriate contributions to the plan, however, no bond was ever posted, nor did Certified agree in the contract of sale to remain secondarily liable. Although the statute was thus not complied with Certified contends that either it or Marine is *now* willing to post any requisite bond[7] and that they will amend the sales agreement to make Certified secondarily liable, thereby satisfying the conditions of § 1384(a). The question is whether it is possible to satisfy the statute in this way.

Although § 1384(a) does not make explicit the time at which the three conditions must be met, its language and structure indicate that the relevant time is when the assets are sold. Since the seller's ac-

---

7. Section 1384 expressly requires that the bond be posted by the "purchaser." Certified is the "seller." The purchaser, Marine, has not entered the case. The court has nothing other than the representations of Certified's counsel that Marine is willing to post the bond.

ceptance of secondary liability is to be included in the contract of sale it necessarily follows that this condition must be met as of the time the contract is executed.

■ Even if we were to accept the proposition that the failure to satisfy the conditions of § 1384 may be cured at a later date, the time for Certified to do so has long since run out. The statute mandates that any dispute between an employer and the plan sponsor concerning a determination made under §§ 1381–1399 shall be resolved through arbitration. 29 U.S.C. § 1401(a). Certified's dispute hinges upon the application of § 1384 and therefore must be resolved through arbitration. However, as noted above, Certified waived its right to arbitration by not acting within the statutory time frame, making the trustees' determination binding.[8]

Defendants point to the possibility that payment of the assessment may result in a double payment or an overpayment. *See T.I.M.E.-DC, supra,* 756 F.2d at 946. (MPPAA "avoids the possibility of double payments by the employer"). No appellate court has discussed the consequences of overpayment or whether the employer is afforded a remedy to avoid such result. In *New York State Teamsters Conference Pension & Retirement Fund v. St. Lawrence Transit Mix Corp.,* 612 F.Supp. 1003, 1009 (N.D.N.Y.1985) the court said:

> Although the court notes the possibility of double recovery, the MPPAA was enacted to protect the Fund. In light of the policy behind ERISA, as amended by the MPPAA, exemptions to a withdrawing employer's liability should be narrowly construed.

In *Long Island Oil Products Co. v. Local 553 Pension Fund,* 775 F.2d 24, 27 (2d Cir.1985), the court said:

> It is not the judiciary's task to balance the economic costs and benefits of a challenged Act, or to measure it against a particular social or economic philosophy (citation omitted). Under our constitutional system, it is for Congress, not the courts, to decide whether legislation is wise and useful. (citation omitted). And so we must defer to the legislature's efforts to regulate economic affairs, asking only in a given case whether Congress had a legitimate legislative purpose which it furthered by rational means.

*See* concurring opinion of Justice Powell in *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 44, 96 S.Ct. 2882, 2906, 49 L.Ed.2d 752 (1976) ("Nor does the Constitution require that legislation or economic matters be compatible with sound economics or even with normal fairness"). Cited with approval in *Long Island Oil Products Co., Inc., supra,* 775 F.2d at 30.

The theory underlying the MPPAA is the obligation of all employers in a multiemployer pension fund toward all the participants in the fund. In a sense the withdrawing employer, in addition to securing benefits for its employees, is obligated to contribute to the fund to assure its financial solvency and responsibility to all the participants in the fund. The withdrawal liability is designed not only to insure against possible default by the withdrawing employer's successor in interest, but other risks and casualties that may befall other contributors to the fund.

In its Report, the House committee stated that it understood "that the issues presented by the legislation are complicated and fraught with uncertainty." H.R. Rep. No. 96–869, *supra,* at 63, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 2932. The primary concern of Congress was "to shore up the finances of the multiemployer plans and encourage their growth." *T.I.M.E.-DC, supra,* 756 F.2d at 941—to protect the participants in their right to benefits.

■ We find that the possibility, probability or even the actuality of overpayment

---

**8.** We note that § 1384(c) authorizes the PBGC to grant variances and exemptions from the requirements of § 1384(a). We do not reach the issue of whether the PBGC may allow the belated compliance with § 1384 that is suggested by defendants since there is no indication in the record that application for such a variance was ever made.

or double payment is not a defense to the demand for withdrawal liability assessment.

▆▆▆ We reject defendants' arguments in attempting to present a genuine fact issue on the affirmative defense of estoppel and laches based on counsel's letters of August 23, 1983 and September 23, 1983 and conversations counsel had with John Cody.[9] Cody was not authorized to bind the Plan to any settlement. It may very well have been a breach of his fiduciary duty to discuss accepting less than what was due the Fund. Sloan, Certified's counsel, should have been aware of Cody's limited authority. In any event, the alleged agreement that adversely affects participants cannot be recognized as enforceable. *Operating Engineers Pension Trust v. Beck Engineering & Surveying*, 746 F.2d 557, 568–69 (9th Cir.1984).

*The Counterclaim*

▆▆▆ The counterclaim is based on a violation of the trustees, (and their predecessors') fiduciary duty to manage the Fund with skill, prudence, and diligence, for the exclusive purpose of providing benefits to participants and their beneficiaries. 29 U.S.C. § 1104. The duty owed by trustees with respect to a plan is "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a). Under 29 U.S.C. § 1132(a)(1) and (2) only a participant or beneficiary or the Secretary of Labor may bring a civil action to enforce rights violated under ERISA. As an "employer," Certified lacks standing to sue to enforce these provisions. *See Tuvia Convalescent Center, Inc. v. National Union of Hospital & Health Care Employees*, 717 F.2d 726, 730 (2d Cir.1983).

**9.** Sloan's affirmation (undated) in support of the motion to stay the proceedings states that Cody on November 19, 1983 agreed with Sloan " ... on behalf of the Fund to permit the transfer of withdrawal liability from Certified to the buyer pursuant to MPPAA, Section 1384(a)(1)(A)–(C)." We do not pass on the propriety of the negotiation with Cody. Counsel for the Fund had written Sloan on September 1, 1983:

**ORDER**

Plaintiffs' motion for summary judgment is granted against Certified Industries, Inc. in the amount of $1,166,865, together with interest at 11% from May 4, 1983. Defendants' motion to stay the proceedings pending arbitration is denied.

A trial of the issues on the claim against defendants IIJ Enterprises, Inc., IIJ Associates, and Split Rock Realty, Inc. will be conducted after the parties have had a reasonable opportunity to conduct pre-trial discovery on the unresolved issues in the case. The question of attorney's fees and costs will await the resolution of the remaining issues.

SO ORDERED.

"It is further the position of the Fund that the dispute resolution procedures set forth in Section 4331 of ERISA have passed and that the amount demanded by the Fund is due and owing."

And indeed after the alleged settlement with Cody on November 28, 1983, Counsel for the Fund demanded full and complete compliance with the assessment and schedule of payments as set forth in its notice of February 9, 1983 as modified in its notice of June 30, 1983.