**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, Plaintiff/Counter–Defendant/Appellant,**

**and**

**Howard McDougall, Trustee, Plaintiff–Appellant,**

**v.**

**BELL TRANSIT COMPANY, a Delaware corporation, Defendant/Counter–Plaintiff/Appellee.**

**No. 93–2519.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 21, 1994.

Decided April 21, 1994.

Terence G. Craig (argued), Central States, Southeast & Southwest Area Pension Fund, Law Dept., Rosemont, IL, for plaintiffs-appellants.

Steven Teplinsky, Leonard R. Kofkin, Donald J. Vogel, Fagel & Haber, Chicago, IL, Mark T. Vuono (argued), Christine M. Dolfi, John A. Vuono, Vuono, Lavelle & Gray, Pittsburgh, PA, for defendant-appellee.

Before MANION, KANNE, and ROVNER, Circuit Judges.

MANION, Circuit Judge.

Central States, Southeast and Southwest Areas Pension Fund ("Central States"), a multiemployer pension plan, appeals a decision of the district court granting summary judgment in favor of Bell Transit Company ("Bell"). 821 F.Supp. 1266. In the district court, Central States sought to vacate the arbitrator's decision that Bell had not incurred withdrawal liability, and sought summary judgment awarding withdrawal liability payments under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1368, as amended by the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. §§ 1381–1461. The district court, however, affirmed the arbitrator's decision (though not all of his reasons) that Bell owed no withdrawal liability, and granted Bell's motion for refund of interim withdrawal liability payments made to Central States during the arbitration process. We affirm.

## I. Background

### A. Statutory Background

■ Before reviewing the facts of this case, a brief overview of the relevant statutory framework is helpful. Congress enacted the MPPAA to cure certain problems arising when an employer ceased to make payments to a pension plan fund and to ensure that such an employer would not leave a plan with vested pension obligations that were only partially funded. *Robbins v. Lady Baltimore Foods, Inc.*, 868 F.2d 258, 261 (7th Cir.1989). To this end, the MPPAA holds an employer who withdraws from a multiemployer pension plan liable for his proportionate share of the "unfunded vested benefits." 29 U.S.C. § 1381(a), (b)(1); *Central States, Southeast and Southwest Areas Health and Welfare Fund v. Cullum Companies, Inc.*, 973 F.2d 1333, 1335 (7th Cir.1992). This so-called withdrawal liability ensures that "the financial burden of [the] employees' vested pension benefits will not be shifted to the other employers in the plan and, ultimately, to the Pension Benefit Guaranty Corpora-

tion, which insures such benefits." *Central States, Southeast and Southwest Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1371 (7th Cir.1992); *see also Central States, Southeast and Southwest Areas Pension Fund v. Bellmont Trucking Co.*, 788 F.2d 428, 432 (7th Cir.1986) ("Withdrawal liability tends to compensate for the shrinkage of the contribution base that occurs when the number of employees on whose behalf contributions are made decreases.").

To collect withdrawal liability under the MPPAA, the plan must first "determine the amount of withdrawal liability owed by a withdrawing employer, 29 U.S.C. §§ 1382, 1391, and send the employer a notice and demand for payment of that amount, 29 U.S.C. § 1399(b)(1)." *Central States, Southeast and Southwest Areas Pension Fund v. Ditello*, 974 F.2d 887, 888 (7th Cir.1992). "An employer who disagrees with a plan's determination of withdrawal liability may ask the plan to review its assessment, 29 U.S.C. § 1399(b)(2), and if still dissatisfied, may initiate arbitration. 29 U.S.C. § 1401(a)(1)." *Ditello*, 974 F.2d at 888. "Arbitration of any dispute concerning a plan's determination of withdrawal liability is mandatory" and if an employer fails to timely initiate arbitration, "the amount of withdrawal liability assessed by the plan becomes due and owing, and the plan can sue to collect it. 29 U.S.C. § 1401(b)(1)." *Ditello*, 974 F.2d at 888. In addition, the exercise of the employer's right to review and arbitrate does not suspend the employer's obligation to pay in accordance with the schedule of payments assessed by the plan. *Jaspan v. Certified Industries, Inc.*, 645 F.Supp. 998, 1004 (E.D.N.Y.1985). "The employer is still liable for payment during the review and appeal period," *id.* (quoting *T.I.M.E.–DC, Inc. v. Management–Labor Welfare & Pension Funds of Local 1730 Int'l Longshoremen's Ass'n*, 756 F.2d 939, 947 (2d Cir.1985)), and litigation instituted by an employer to contest the liability will not suspend the dates set for payment in the Act. *Jaspan*, 645 F.Supp. at 1004.

Not all employers who withdraw from a plan are required to pay withdrawal liability, however. If, for example, an employer meets the statutory requirements of § 1384,

the "sale of assets" exemption, it can avoid the imposition of otherwise assessable withdrawal liability. *Cullum*, 973 F.2d at 1335. Under § 1384, an employer's bona fide, arm's-length sale of assets to an unrelated party, 29 U.S.C. § 1384(a)(1), does not trigger withdrawal liability if the sale meets the following requirements:

> (1) "the purchaser has an obligation to contribute to the plan," 29 U.S.C. § 1384(a)(1)(A);
>
> (2) the purchaser provides a five-year bond which is payable to the pension plan "if the purchaser withdraws from the plan, or fails to make a contribution to the plan when due," during the first five years after the sale, 29 U.S.C. § 1384(a)(1)(B); and
>
> (3) the contract for sale provides that the seller is secondarily liable for any withdrawal liability during the first five years after the sale, 29 U.S.C. § 1384(a)(1)(C).

*Id.*

To ensure the security of the plan, Congress also added two other provisions to § 1384(a). Section 1384(a)(2) requires that the seller pay to the plan the withdrawal liability "that would have been due from the seller but for this section" if the purchaser withdraws from the plan before the last day of the fifth plan year beginning after the sale and fails to make any withdrawal liability payment when due. 29 U.S.C. § 1384(a)(2); *id.* at 1340. In addition, § 1384(a)(3)(A) requires the seller to post a bond or provide an amount in escrow if "all, or substantially all, of the seller's assets are distributed, or if the seller is liquidated before the end of the 5 plan year period described in paragraph (1)(C)." 29 U.S.C. § 1384(a)(3)(A). This bond or escrow account shall be "equal to the present value of the withdrawal liability the seller would have had but for this subsection" and is established under these circumstances in order to protect the seller's secondary liability provided for in § 1384(a)(1)(C) and (a)(2). 29 U.S.C. § 1384(a)(3)(A); *New York State Teamsters Conference Pension & Retirement Fund, Nolan v. St. Lawrence Transit Mix Corp.*, 612 F.Supp. 1003, 1009 (N.D.N.Y.1985). Against this background, we consider the facts of this case.

*B. Facts and Procedural History*

The material facts in this case are not in dispute. For a number of years, Bell Transit Company had a collective bargaining relationship with the International Brotherhood of Teamsters, Local 377, under which it made pension contributions to Central States on behalf of covered bargaining unit employees. On or about May 3, 1987, Bell terminated its covered operations and ceased to have an obligation to contribute to the plan. In connection with this termination, Bell sold substantially all of its assets to Best Transport Inc. ("the purchaser"), an unrelated third party not involved in this litigation.

Bell's cessation of operations ordinarily would have triggered withdrawal liability under the MPPAA. In order to avoid withdrawal liability, however, Bell structured its sale according to the requirements of 29 U.S.C. § 1384(a)(1), the "sale of assets" exemption. The parties agree that each of the three requirements found in § 1384(a)(1) were met and that the purchaser never defaulted on its obligation to contribute to the plan under § 1384(a)(1)(A).

After the sale, Bell began winding up its affairs. The directors and shareholders of Bell adopted a "Plan of Complete Liquidation" on June 15, 1987. Bell closed its office on June 26, 1987, and on July 31, 1987 its balance sheet showed that its operating assets had been reduced to approximately $388,000.00 in cash. Rather than distribute the remaining cash, however, Bell decided to hold it in interest bearing accounts until the five year period of its secondary liability under § 1384(a)(2) expired.

In 1990, Central States discovered that Bell had converted its assets into cash at approximately the same time as its sale to Best Transport. Central States concluded from this that Bell was "liquidated" within the meaning of § 1384(a)(3)(A). Since Bell had not provided a seller's bond, as required by that subsection, Central States concluded that the sale as a whole failed to qualify under § 1384's "sale of assets" exemption.[1]

---

**1.** On October 13, 1987 and September 27, 1988, Bell wrote to Central States advising the plan of

Central States therefore assessed Bell on March 19, 1990 for withdrawal liability in the amount of $734,685.60. On June 18, 1990 Bell requested a review of the decision and on September 4, 1990, Central States rejected all of Bell's contentions. Bell demanded arbitration on November 2, 1990. In the meantime, Bell began making interim withdrawal liability payments to Central States while the review and arbitration process proceeded.

On June 2, 1992, an arbitration hearing was held in Chicago, Illinois. Before the arbitrator, Bell argued two points: first, that it had not "liquidated" within the meaning of § 1384(a)(3)(A) and therefore did not need to post the seller's bond required in that section and, second, even if Bell were in violation of section (a)(3)(A) for failure to post a bond, such violation would not by itself trigger (or, more accurately, reimpose) withdrawal liability on an otherwise compliant sale. The arbitrator agreed on both counts, finding first that Bell had not violated § 1384(a)(3)(A). The arbitrator found that Bell had not taken any steps to legally dissolve the corporation under its plan of liquidation and had not distributed its remaining assets. The arbitrator concluded therefore that, while Bell had "liquified" (that is, turned its assets into cash), the corporation itself had not been "liquidated." Because the statute requires that the "seller is liquidated" before a bond is required, Congress could not have meant for the bond to be posted while the corporation was still in existence and still held liquid assets. The arbitrator then went on to conclude that even if there had been a violation of § 1384(a)(3)(A), such violation would not trigger withdrawal liability. The arbitrator pointed to the separate placement of the seller's bond in § 1384(a)(3)(A), discussed the language used in the statute, and noted the existence of other remedies for enforcing the bond. The arbitrator also compared the purchaser's bond in § 1384(a)(1)(B), noncompliance with which will trigger withdrawal liability, to the seller's bond and concluded that Congress distinguished between the importance of the

its intention to comply with bonding requirements if it liquidated or distributed its assets

purchaser's primary liability and the seller's secondary liability in fashioning its remedies. He concluded that Congress intended different consequences to attach to the failure to post the two types of bonds and that no withdrawal liability should therefore be imposed for a violation of § 1384(a)(3)(A).

The district court affirmed the arbitrator's decision, but differed in its interpretation of § 1384(a)(3)(A). The court concluded that the arbitrator's interpretation of the term "liquidated" in section (a)(3)(A) would equate the phrase "the seller is liquidated" with the phrase "the seller's assets are distributed." The court concluded that, because Congress did not intend any phrase to be redundant or superfluous, the arbitrator's interpretation could not be correct. The court chose instead to interpret "liquidated" in section (a)(3)(A) to mean that all or substantially all of the seller's assets had been converted to cash. Under this interpretation Bell had "liquidated" and was therefore in violation of § 1384(a)(3)(A) for failure to post a bond. The court, however, concluded that, since there was no dispute among the parties that all of the requirements of § 1384(a)(1) had been met, and since the court agreed with the arbitrator that a violation of section (a)(3)(A) does not trigger withdrawal liability, Bell did not owe Central States the withdrawal liability assessed against it. The court therefore granted summary judgment in favor of Bell and ordered Central States to refund $576,694.53 plus interest in withdrawal liability payments paid by Bell pending the outcome of the review and arbitration process.

### C. Issues on Appeal

On appeal Central States argues that the district court erred in concluding that the failure to post a bond under 29 U.S.C. § 1384(a)(3)(A) will not trigger or reimpose withdrawal liability on a sale of assets otherwise in compliance with § 1384. Bell cross-appeals alleging that the district court erred in its interpretation of § 1384(a)(3)(A) and therefore erred in concluding that Bell had

within the applicable five-year period.

"liquidated" within the meaning of that section, making it liable to post a bond. We address only Central States' argument on the question of withdrawal liability.[2]

## II. Analysis

■ The question before us is very narrow: Whether the failure to post a bond under § 1384(a)(3)(A) imposes withdrawal liability on a sale of assets otherwise in compliance with § 1384. Or, phrased differently, in order to obtain relief from withdrawal liability under the MPPAA, must a seller post a bond under § 1384(a)(3)(A), if applicable, as a fourth requirement in addition to the three express requirements set out in § 1384(a)(1)? We review the arbitrator's legal determinations *de novo, Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp.,* 872 F.2d 208, 211 (7th Cir.), *cert. denied,* 493 U.S. 847, 110 S.Ct. 143, 107 L.Ed.2d 102 (1989), and affirm a grant of summary judgment when no genuine issues of material fact exist and when the moving party is entitled to judgment as a matter of law. *Central States, Southeast & Southwest Areas Pension Fund v. Jordan,* 873 F.2d 149, 152 (7th Cir.1989).

As with all cases of statutory construction, we focus on the statutory language as the most reliable indicator of congressional intent. *Bellmont Trucking,* 788 F.2d at 433. "[W]e must ensure that the plain meaning of the statute is applied, not bypassed," *Cullum,* 973 F.2d at 1337, and where the statute's language is plain, the sole function of the courts is to enforce it according to its terms. *Matter of Witkowski,* 16 F.3d 739, 742 (7th Cir.1994). In drafting the provisions at hand, Congress itself decided what rules, and exceptions to those rules, would best achieve its goals. *See Bellmont Trucking,* 788 F.2d at 433. We are bound by the particular rules enacted by Congress and are

not free to carve out our own exceptions merely because we believe that they would best serve Congress' policies and goals. *Id.*

In this case, Congress placed the three express requirements for waiver in § 1384(a)(1), but placed the seller's bond in § 1384(a)(3)(A)—a completely different section. Central States argues that this placement is of no material consequence. Congress, it is alleged, meant to protect vulnerable pension plans and in order to do so *all* provisions of § 1384(a), no matter where they reside, must be complied with or the seller risks the imposition of withdrawal liability. Central States reasons that without this penalty the congressional purpose behind the addition of the MPPAA could be seriously threatened.

We do not agree. The provisions of § 1384(a) were carefully drafted in four separate sections. Section (a)(1) contains the language of exemption:

(1) A complete or partial withdrawal of an employer (hereinafter in this section referred to as the "seller") under this section does not occur solely because, as a result of a bona fide, arm's-length sale of assets to an unrelated party (hereinafter in this section referred to as the "purchaser"), the seller ceases covered operations or ceases to have an obligation to contribute for such operations, if—

(A) [the purchaser has an obligation to contribute to the plan];

(B) [the purchaser provides a bond]; and

(C) [the seller has a contractual obligation for secondary liability].

This language does not spill over into the remaining three sections. Sections (a)(2), (a)(3), and (a)(4)[3] of § 1384 all contain their own provisions and specific complementary

---

**2.** The question raised by Bell and discussed by the arbitrator and the district court, regarding the interpretation of the term "liquidated" in § 1384(a)(3)(A), is an interesting question and one worthy of discussion. It is, however, a fact-specific issue that is unnecessary to the disposition of this case. We therefore decline to decide it here. Nothing in this opinion should therefore be construed as favoring one interpretation over another.

**3.** While not pertinent to the issue before us, we mention § 1384(a)(4) here for the sake of completeness. This section provides that "[t]he liability of the party furnishing a bond or escrow under this subsection shall be reduced, upon payment of the bond or escrow to the plan, by the amount thereof."

duties, but none contains language indicating that the protection afforded by section (a)(1) is forfeited upon a violation of a later section. For example, section (a)(2) states:

(2) If the purchaser—

(A) withdraws before the last day of the fifth plan year beginning after the sale, and

(B) fails to make any withdrawal liability payment when due,

then the seller shall pay to the plan an amount equal to the payment that would have been due from the seller but for this section.

This section assures that the seller's secondary liability, put in place by § 1384(a)(1)(C), is enforced where the purchaser fails in its obligations to the plan. This section expressly imposes withdrawal liability only upon this subsequent condition and is otherwise quite independent of the conditions and requirements listed in section (a)(1). Indeed, section (a)(2) is itself a remedy for noncompliance with agreements made under section (a)(1). In addition, the language of section (a)(2) also indicates that the seller is otherwise safe from the imposition of liability under this section—specifically stating that "the seller shall pay to the plan an amount equal to the payment *that would have been due from the seller but for this section."* (Emphasis added.)

The specific section at issue here, section (a)(3)(A), is similar:

(3)(A) If all, or substantially all, of the seller's assets are distributed, or if the seller is liquidated before the end of the 5 plan year period described in paragraph (1)(C), then the seller shall provide a bond or amount in escrow equal to the present value of the withdrawal liability the seller would have had but for this subsection.[4] This is another safeguard provided by Congress to ensure the availability of funds to secure the seller's secondary liability under sections (a)(1)(C) and (a)(2) in cases where the seller, for whatever reason, disappears inside the five-year period. *Cullum,* 973 F.2d at 1340; *New York State Teamsters,* 612 F.Supp. at 1009. Nothing in the language of this section, however, can be construed as revoking the protection granted in section (a)(1). It contains no language similar to that used in section (a)(2), requiring payment to the plan upon certain conditions, and is itself a remedy safeguarding any obligation for secondary liability under section (a)(2) where the seller is liquidated or the seller's assets are distributed. In addition, similar to section (a)(2), section (a)(3)(A) contains language stating that "the seller would have had [withdrawal liability] but for this subsection," indicating that the protection of section (a)(1) remains intact quite apart from the bond (or escrow) requirement imposed here.[5] There is therefore nothing in this section that will allow the construction urged on us by Central States. It simply cannot be construed as an additional requirement to avoid withdrawal liability under § 1384(a)(1).

■ Even if the statutory language itself were not enough to reach our conclusion in this case, our previous decision in *Cullum* settles any doubt. In *Cullum* we noted that § 1384 "provides, in effect, a 'safe harbor' protecting an employer from withdrawal liability with respect to a sale of assets that meets certain requirements, all of which are designed to shift the obligation for contributions to the purchaser while leaving the seller secondarily liable for a five-year period after the sale." *Cullum,* 973 F.2d at 1337 (quoting

---

4. The statute also provides for a bond in cases where there is only a partial distribution of assets by a seller. Section 1384(a)(3)(B) provides:

(B) If only a portion of the seller's assets are distributed during such period, then a bond or escrow shall be required, in accordance with regulations prescribed by the corporation, in a manner consistent with subparagraph (A).

Only § 1384(a)(3)(A) is at issue in this case.

5. We note that § 1384(a)(3)(A) uses the word "subsection" when describing the safe harbor provision, while section (a)(2) uses the word "section." Any distinction in terms is, however, immaterial to this case. Section § 1384(a)(3)(A) clearly does not refer to itself by the use of the word "subsection." This is demonstrated by the internal reference to section (a)(3)(A) in section (a)(3)(B) which specifically refers to the former as "subparagraph (A)" and not subsection (A). The reference to withdrawal liability in this section is therefore directed outside of section (a)(3)(A) to some other provision in the statute, presumably section (a)(1).

*I.A.M. Nat'l Pension Fund, Plan A, A Benefits v. Clinton Engines Corp.*, 825 F.2d 415, 420 (D.C.Cir.1987)). Once the provisions of § 1384(a)(1) are met, what occurs after the sale is irrelevant to the question of withdrawal liability. *See Cullum*, 973 F.2d at 1338. As a general rule, the time for determining whether the three conditions are met, and withdrawal liability is avoided, is at the time that the assets are sold, not afterwards.[6] *Id.; Jaspan*, 645 F.Supp. at 1005. There is nothing in the language of the statute which indicates that anything further—such as the future fulfillment of the obligations agreed to in section (a)(1)—is required. *Cullum*, 973 F.2d at 1338. Therefore, once the seller has complied with the requirements of section (a)(1) at the time of the sale, the seller is within § 1384(a)'s safe harbor and the plan must pursue any subsequent violations using the remedies provided in the statute: first, the assessment of withdrawal liability against the purchaser, and then, if that fails, the plan may collect the purchaser's bond posted in accordance with section (a)(1)(B) or seek to collect from the seller based on the seller's secondary liability. *See id.* at 1340.

The implications of *Cullum* for this case are clear. The three provisions in § 1384(a)(1) were met by Bell at the time of its sale to Best Transport. That has never been contested. According to *Cullum*, that is all that was needed to avoid withdrawal liability under the MPPAA. While *Cullum* did not specifically address the failure to post a seller's bond, it did state clearly that nothing in the statutory language indicates that anything further—specifically future compliance with agreements made under the statute—will impose withdrawal liability. Therefore, once Bell met the three requirements listed in § 1384(a)(1), it was firmly anchored in § 1384's safe harbor and Central States had to proceed against it using the remedies available in the statute.

Based on the foregoing, we decline Central States' invitation to add compliance with section (a)(3)(A) to the requirements listed in section (a)(1) in order to avoid withdrawal liability under § 1384. If Congress had wanted noncompliance with the seller's bond to trigger withdrawal liability, it could have added it to the specific requirements delineated in section (a)(1). That it did not, when it clearly knew how, demonstrates that Congress did not wish to impose withdrawal liability here. For us to add such a remedy—and a rather draconian one at that—would clearly upset the balance of remedies struck by Congress between the seller and the plan. *Id.* at 1339 " 'Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard fought compromises. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.' " (quoting *Board of Governors of Federal Reserve System v. Dimension Fin. Corp.*, 474 U.S. 361, 373–74, 106 S.Ct. 681, 688–89, 88 L.Ed.2d 691 (1989)). In so holding, we also decline to create perpetual insecurity on the part of those arranging the sale of their businesses under this exemption and further decline to provide a potential windfall to funds such as Central States which, at least in this case, never ceased to receive contributions from the purchaser as agreed under § 1384(a)(1)(A).

Central States objects to our decision in this case by arguing that, without the ability to assess withdrawal liability, it is left with no remedy for violations of § 1384(a)(3)(A). Again, we disagree. Section 1451, an enforcement provision of the MPPAA entitled "Civil action," provides:

(1) A plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer plan, or an employee organization which represents such a plan participant or beneficiary for purposes of collec-

---

**6.** We note that there are some circumstances where the parties to a sale under § 1384(a)(1) may apply for a variance from the purchaser's bond requirement in section (a)(1)(B) and the seller's secondary liability contract requirement in section (a)(1)(C). 29 C.F.R. § 2643.11. We make no comment on these circumstances as they are not relevant to the case at hand.

tive bargaining, may bring an action for appropriate legal or equitable relief, or both.

The phrase "this subtitle" in § 1451 includes the sale of assets exemption in § 1384, and we therefore see no reason why Central States could not enforce the seller's bond requirement through normal legal channels should a seller be found in violation of § 1384(a)(3)(A).[7] It may be true that, by the time the plan discovers such a violation, the seller has long since disappeared and therefore does not have the ability to meet the requirements of § 1384(a)(3)(A). But if that is the case, we do not see how such a seller would be in any better position to pay withdrawal liability. Indeed, the very purpose of the seller's bond (or escrow account) is to make sure that such funds are available in order to secure the seller's secondary obligation for withdrawal liability. The problem of the disappearing seller will be no better served by imposing withdrawal liability than it would by simply enforcing the bond requirement as it is now in the statute.

### III. Conclusion

The plain language of § 1384, including each of its four individual sections, does not support the imposition of withdrawal liability for a violation of § 1384(a)(3)(A), and we decline to add section (a)(3)(A) to the list of three requirements needed at the time of sale to avoid withdrawal liability in section (a)(1). In this case, Central States wanted to collect primary withdrawal liability from a seller that was only secondarily liable, simply because that seller did not post a bond securing that secondary liability. Of course, all this is in the context of a purchaser who had not defaulted but continued to make all of its contributions to the plan under section (a)(1)(A). This interpretation would have given Central States a double recovery. Such an extraordinary remedy, as noted above, is not contemplated by the statute. *Cf. Teamsters Pension Trust Fund of Phila. and Vicinity v. Central Mich. Trucking, Inc.,* 857 F.2d 1107, 1109 (6th Cir.1988) ("There is no congressional mandate to engage in legal gymnastics in order to guarantee pension plans at all costs.").

For the foregoing reasons, the decision of the district court, granting summary judgment in favor of Bell and ordering a refund of interim withdrawal liability payments plus interest, is

Affirmed.

---

7. Indeed, this is what was contemplated by the district court. Specifically, the court found that the "fund would have been entitled to demand that Bell provide the bond or escrow and to pursue such relief if Bell refused."