DENNIS JACOBS, Chief Judge,
dissenting:
I agree with much of the majority opinion; but because I part company on one decisive point, and urge an analysis that was not expressly argued on appeal, I respectfully dissent.
Under the Multiemployer Pension Plan Amendments Act of 1980 (“MPPAA”), an employer that withdraws from a plan— either by ending contributions or by dipping below 30% of its contribution level — is liable for its proportionate share of the unfunded vested benefits, with exceptions. See 29 U.S.C. §§ 1381, 1383, 1385. If a company ceases making contributions because it has sold its assets, the MPPAA provides an exemption from withdrawal liability upon three conditions, including that the purchaser undertakes “an obligation to contribute to the plan with respect to the operations for substantially the same number of contribution base units for which the seller had an obligation to contribute to the plan.” Id. § 1384(a)(1)(A). Here, the buyer undertook just such an obligation when it stepped into the seller’s shoes pursuant to the Asset Purchase Agreement (the “Purchase Agreement”). Because the buyer’s post-sale obligations were identical to the *164 seller’s obligations pre-sale, the transaction complied with the sale-of-assets exemption.
I
Under the sale-of-assets exemption from withdrawal liability, a seller is deemed to have withdrawn from a multi-employer pension plan following a bona fide arm’s-length asset sale unless three conditions are satisfied. It is stipulated that two of these conditions have been satisfied here, in the sale of Madison Oil by HOP Energy, LLC, to Approved Oil Company. First, Approved has posted a bond (for the greater of the three-year average of HOP’s contributions or its contribution in the year before the sale), payable if Approved withdraws from the plan or defaults within five years of the sale. Id. § 1384(a)(1)(B). Second, the Purchase Agreement provides that, if Approved withdraws from the plan within five years after the sale, HOP as seller is secondarily liable for any withdrawal liability. Id. § 1384(a)(1)(C).
Given compliance with these two conditions, payment of withdrawal liability is secured even if the successor employer withdraws. In this way, the purpose of the statute — the assured funding of multiemployer plans — is achieved. See Park S. Hotel Corp. v. N.Y. Hotel Trades Council, 851 F.2d 578, 580 (2d Cir.1988); see also 29 U.S.C. § 1369(a) (imposing liability where “a principal purpose of any person in entering into any transaction is to evade liability to which such person would be subject” under the MPPAA). Even so, however, compliance with those two conditions secures withdrawal liability only if the buyer uses the assets to continue the business: The triggering event — the buyer’s withdrawal — can occur only if the buyer first assumes the obligation to contribute.
The buyer’s obligation to contribute is assured by the third condition, the one at issue on this appeal: that “the purchaser [have] an obligation to contribute to the plan with respect to the operations for substantially the same number of contribution base units for which the seller had an obligation to contribute to the plan.” Id. § 1384(a)(1)(A). An “obligation to contribute” may arise, as here, under a collective bargaining agreement (“CBA”). Id. § 1392(a)(1).
II
As the majority opinion reads the third condition, the buyer’s ongoing obligation is to contribute in the future at substantially the same level as the seller’s contributions as of the transaction date. One remarkable feature of that reading is that it has no end-point. The majority opinion does not reach that issue, and the parties do not argue it. But it seems to me decisive that the obligation recognized in the majority opinion runs to an unspecified future, or in perpetuity. That would be an unaccountable omission in a statute that elsewhere (as set out above) fixes exact time parameters for the obligations it creates: the period of the bond (five years), the contribution periods for calculating the bond amount (three years or one, depending), the period of the seller’s indemnity for the buyer’s obligation (five years).
I do not believe that the third condition requires the buyer to commit to maintain a historical level of contributions for an unknown time in the future. In my view, the purchaser’s obligation is a test, applied at the time of the sale transaction, and does not outlive the transition from one employer to the other. See Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Cullum, 973 F.2d 1333, 1338 (7th Cir.1992) (“The time for determining whether the requirement in section 1384(a)(1)(A) has *165 been met is at the time of the sale, not afterwards.”); Jaspan v. Certified Indus., Inc., 645 F.Supp. 998, 1005 (E.D.N.Y.1985) (same).
The evident purpose of the condition is to establish continuity between the obligations of the seller immediately prior to the sale and the obligations of the buyer immediately thereafter. It requires the buyer to take the assets subject to the collective bargaining agreement of the seller (or enter into one of its own), and thus prevents the buyer from severing the physical assets of the business from the human capital that worked them. So if the buyer intends to resell the assets or move the business elsewhere, and thereby avoid assuming the seller’s obligations under the plan, then the seller will be assessed withdrawal liability; the seller can avoid liability only if the buyer inherits the seller’s contribution obligations going forward. An analogous provision is § 1398(1), which states that no withdrawal liability is incurred following certain changes in ownership structure, such as mergers and consolidations, so long as “the change causes no interruption in employer contributions or obligations to contribute under the plan.” 29 U.S.C. § 1398(1).
Once the third condition is satisfied, that is, once the seller’s contribution obligation passes to the buyer, the plan suffers no harm on account of the transaction alone. The purchaser may later increase or reduce the aggregate number of hours worked by its employees (with such consequences as the CBA and the statute may provide); but these are operational decisions that the seller was free to make if there had been no sale. What comes after, once the buyer is in the shoes of the seller, is that the buyer may go wherever the seller could have gone.
Ill
The transaction at issue complied with the sale-of-assets exemption from withdrawal liability. Under the CBA to which HOP and Approved were both signatories, employers are required to make contributions to the Local 553 Pension Fund (the “Fund”) for “all hours of which pay is drawn by an employer for each of his employees covered by the collective bargaining agreement” at a specified hourly rate which increases annually (subject to a 1700 hour cap per employee per year). As the majority opinion demonstrates, the relevant “contribution base unit” is therefore each hour worked by covered employees. See id. § 1301(a)(ll). The Purchase Agreement duly provides (adapting the wording of the statute) that Approved “shall make contributions to the Local 553 Pension Fund ... for substantially the same number of contribution base units for which [HOP] had an obligation to contribute with respect to the operations covered by the Teamster’s Fund.” By virtue of this wording, as well as Approved’s express assumption of HOP’s CBA and Approved’s own CBA with Teamster’s Local 553, Approved undertook substantially the same contribution obligation that HOP had prior to the sale: to contribute a particular amount for each hour worked by its covered employees. Presale, HOP had no obligation to maintain any particular absolute contribution level from month to month or year to year; the statute demands no more from Approved.
The buyer’s necessary obligation is in no way undermined by the proviso in the Purchase Agreement that it does not “limit [Approved’s] right to discharge, lay off or hire employees or otherwise to manage the operations of the Business, including the right to amend, revise or terminate any collective bargaining agreement currently in effect and, as a consequence, reduce to *166 any extent the number of contribution base units with respect to which [Approved] has an obligation to contribute to any plan.” This proviso is an admirable summary of the right that HOP enjoyed prior to the transaction, and that Approved enjoys under substantive labor law and the CBA. Every other contributor to the Fund enjoys that same right.
IV
The majority opinion matters because it can be read to say (though it does not hold) that a purchaser of assets must agree not to reduce its plan contributions (ie., not to reduce the number of hours worked by its employees) forever, come hell or high water. Of course, this would render many businesses unsalable. Any obligation to maintain historical contribution levels into the future, perpetual or not, raises radical and expensive uncertainties. HOP’s withdrawal liability, fully one-third of the $3.6 million purchase price, is imposed because the statutory undertaking recited in the Purchase Agreement was qualified by a proviso that affirms the right of Approved to control the business going forward. The prospect of such a punishing liability may compel sellers to insist on an undertaking by the purchaser that omits the proviso and that therefore might be read to guarantee the seller’s historical contribution levels ad infinitum. But what rational buyer would be willing to acquire a business if it had to make such a commitment, and assume unknown risks for an unknown period?
I would reverse.