**CENTRAL STATES SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, Plaintiff-Appellee,**

v.

**BELLMONT TRUCKING CO., INC., Defendant-Appellant.**

No. 85–2158.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 26, 1986.

Decided April 4, 1986.

Steven L. Jackson, Parrish, Knight, Jackson & Beal, Ft. Wayne, Ind., for defendant-appellant.

Terence G. Craig, John E. Bardgett, Gen. Counsel, Karen I. Ward, Assoc. Gen. Counsel, Thomas J. Angell and Bruce Perlin, Central States Law Dept., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and BARKER, District Judge.[*]

CUDAHY, Circuit Judge.

Defendant, Bellmont Trucking Co. ("Bellmont") appeals the district court's determination that it owes withdrawal liability to

---

[*] Honorable Sarah Evans Barker, District Judge for the Southern District of Indiana, is sitting by designation.

plaintiff, Central States Southeast and Southwest Areas Pension Fund (the "Fund"), as a result of Bellmont's bankruptcy, 610 F.Supp. 1505. We affirm.

## I.

Bellmont operated a trucking business. Its drivers were members of Teamsters Local No. 414. Bellmont, by virtue of its membership in the Indiana Motor Carriers Labor Relations Association, was a signatory to the National Master Freight Agreement, which requires that employers make contributions to the Fund to fund the pension benefits of their employees.

In July 1983 Bellmont filed a petition in bankruptcy under Chapter 11 of the Bankruptcy Code. At this time Bellmont's obligation to make payments to the Fund ceased. The Fund determined, however, that under the Multi-Employer Pension Plan Amendments Act of 1980 (the "MPPAA"), 29 U.S.C. § 1381 et seq., Bellmont had withdrawn from the Fund and thus incurred withdrawal liability. Bellmont admitted that if liability existed, the amount would be $110,122.80. The district court removed the withdrawal liability claim from the bankruptcy court. The parties filed cross-motions for summary judgment and the district court granted the Fund's motion. This appeal followed.

Bellmont argues that it should not be subject to withdrawal liability because the relationship between its former employees and the Fund remains unchanged. Of the eight employees who worked for Bellmont during its last year of operation, five retired. Employers are not obligated to make contributions to the Fund on behalf of retired employees. The other three presently work for other employers in the industry and are still represented by Teamsters Local 414. Their current employers are obligated to make contributions to the Fund on their behalf. Defendant argues:

> Thus, all of Bellmont's former employees who still work have contributions made on their behalf to the Fund in the same amount and at the same rate as while they were working for Bellmont.

The net effect of Bellmont's bankruptcy is that the Fund receives the contributions it would have (assuming the retirees had retired)—the only difference is the change in the payor. The payee and the beneficiaries remain precisely the same.

Appellant's Brief at 8–9.

Defendant argues that the MPPAA carves out certain exceptions to the generally applicable rule for imposition of liability on an employer upon its withdrawal from the pension plan. Although Bellmont admittedly cannot take advantage of any of these statutory exceptions, defendant argues that two district court cases stand for the proposition that so long as the relationship between the fund and its workers/beneficiaries remains unchanged, no withdrawal liability should be imposed. See Dorn's Transportation, Inc. v. Teamsters Pension Trust Fund, 596 F.Supp. 350 (D.N.J. 1984); Dyck v. Southern Pacific Milling Co., 4 E.B.C. 1346 (C.D.Cal.1983). Further, defendant argues that the purpose of the MPPAA is to create a disincentive for employers who deliberately withdraw from pension plans to gain an economic advantage. Because Bellmont did not "voluntarily" withdraw to gain an economic advantage, but rather withdrew because it filed in bankruptcy, defendant argues that no withdrawal liability was intended by Congress. Defendant also argues that the district court's decision unjustly enriches the Fund.

## II.

The MPPAA provides that "[i]f an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability." 29 U.S.C. § 1381(a). A complete withdrawal occurs "when an employer—(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a). It is not disputed that Bellmont permanently ceased to

have an obligation to contribute under the plan when it filed its bankruptcy petition. Subsections (b) and (c) of 29 U.S.C. § 1383 carve out certain exceptions for the construction industry and the entertainment industry. Subsection (d) carves out an exception for employers who contribute to a plan primarily for work in the long and short haul trucking industry, the household goods industry or the public warehousing industry if substantially all of the contributions required under the plan are made by employers primarily engaged in such industries. If subsection (d) applies, a complete withdrawal occurs only if

(A) an employer permanently ceases to have an obligation to contribute under the plan or permanently ceases all covered operations under the plan, and

(B) either—

(i) the corporation determines that the plan has suffered substantial damage to its contribution base as a result of such cessation, or

(ii) the employer fails to furnish a bond issued by a corporate surety company that is an acceptable surety for purposes of section 1112 of this title, or an amount held in escrow by a bank or similar financial institution satisfactory to the plan, in an amount equal to 50 percent of the withdrawal liability of the employer.

29 U.S.C. § 1383(d)(3). The district court, however, determined that subsection (d) does not apply in this case because "substantially all of the contributions" to the Fund were not made by employers in one of the excepted industries. Bellmont does not appeal this determination.

Other exceptions to the general rule of withdrawal liability articulated in section 1381(a) are found in sections 1384 and 1398. Section 1398 provides:

Notwithstanding any other provision of this part, an employer shall not be considered to have withdrawn from a plan solely because—

(1) an employer ceases to exist by reason of—

(A) a change in corporate structure described in section 1362(d) of this title, or

(B) a change to an unincorporated form of business enterprise,

if the change causes no interruption in employer contributions or obligations to contribute under the plan, or

(2) an employer suspends contributions under the plan during a labor dispute involving its employees.

For purposes of this part, a successor or parent corporation or other entity resulting from any such change shall be considered the original employer.

29 U.S.C. § 1398. Section 1384 provides that a complete or partial withdrawal does not occur solely because of an arm's length sale of assets to an unrelated party if certain conditions are met. Bellmont does not argue that it meets the requirements of either section 1398 or section 1384.

■■■■ Because Bellmont does not argue that it falls within any of the statutory exemptions for withdrawal liability, its reliance on *Dorn's* and *Dyck* is misplaced. In *Dorn's* Oneida Motor Freight purchased all of the outstanding stock of Dorn's. The court found that Dorn's was exempted from withdrawal liability because the requirements of section 1398 were met. The case before us does not involve a similar change in corporate structure that is exempted under section 1398. The court in *Dorn's* alternatively held that there was no withdrawal liability because Dorn's and Oneida were a single employer within the meaning of section 1301(b). Section 1301(b) defines a single employer as "trades or businesses" whose employees "are under common control." It was in this context that the court made the comments relied upon by Bellmont.[1] Defend-

---

**1.** Defendant relies upon the following language in *Dorn's:*

Second, the basis of the finding of no liability in *Dyck* was that the employees remained

in exactly the same position after the facilities were transferred as they were before the transfer. While the same cannot quite be said for the Dorn's-Oneida employees, those em-

ant does not argue that it and its former employees' subsequent employers should be treated as a single employer under section 1301(b)(1). Hence *Dorn's* is inapplicable to the case before us.

In *Dyck* the court held that a transfer of facilities from one subsidiary to another of the same corporate parent was not a partial withdrawal because the companies constituted a single employer under section 1301(b)(1). The court commented on the fact that the employment status of the employees at the transferred facilities was the same as before the transfer in the context of deciding whether the successor employer should be bound by the terms of a collective bargaining agreement entered into by its predecessor. Neither *Dyck* nor *Dorn's* held that there is no withdrawal liability merely because the relationship between the employees and the Fund remains unchanged. Both cases relied upon statutory exceptions to the imposition of withdrawal liability.

Defendant also argues that none of the policies of the MPPAA are furthered by imposing withdrawal liability in this case. First, we think that the policies of the MPPAA are furthered by imposing liability. As we noted in *Peick v. Pension Benefit Guaranty Corporation*, 724 F.2d 1247, 1267 (7th Cir.1983), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984), Congress was concerned not only with reducing incentives to withdraw from multiemployer plans, but also with offsetting "the burden otherwise shifted to the remaining employers when a withdrawal nevertheless occurs." Withdrawal liability tends to compensate for the shrinkage of the contribution base that occurs when the number of employees on whose behalf contributions are made decreases. *See Pension Benefit Guaranty Corp. v. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 2714 n. 2, 81 L.Ed.2d 601 (1984).[2]

The contribution base of a pension plan depends upon the number of covered jobs with respect to which contributions are be-

---

ployees are in substantially the same position as they were before the sale. All Dorn's employees at the Pennsauken terminal were given the opportunity to continue employment with Oneida, and ten of the twelve employees did so; the routes they drive are substantially the same; they continue membership in the same union local; and Oneida continues to contribute to the fund in their behalf. They may not be under the same collective bargaining agreement as they had with Dorn's, but their seniority rights after the transfer were determined in a March 3, 1981 proceeding before the Teamsters Philadelphia and Vicinity Joint Area Committee. *See* Decision of Joint Area Committee, Plaintiffs' App. at 52. *I thus find that, for the purposes of determining withdrawal liability, Dorn's and Oneida are a single employer within the meaning of § 1301(b), and are not liable for withdrawal payments under the MPPAA.*

The MPPAA is intended to ensure that employers do not evade their obligations to multiemployer funds by withdrawing from such funds. Here, however, the beneficiaries of the fund remained in substantially the same position and contributions to the fund remained substantially the same. This does not appear to be the type of situation that Congress sought to address in enacting the MPPAA.

*Dorn's*, 596 F.Supp. at 355 (emphasis supplied). Defendant, in quoting the above paragraphs in

its brief, omitted the language italicized above without even noting the omission with an ellipsis. The omitted sentence clearly reveals that the court in *Dorn's* relied upon the statutory exception found at section 1301(b), rather than upon the mere fact that the employees remained in the same position. Thus while the position of the employees relative to the Fund may be relevant in determining whether the employees can be considered a single employer under section 1301(b), it is irrelevant when section 1301(b) is not applicable, as in this case.

2. Defendant argues that the contribution base did not contract in this particular instance. Although we do not have sufficient evidence before us to decide whether this is correct (and we do not believe it controlling of Congress's choice *in principle* of the allowed exceptions), we think that defendant's argument is premised on some shaky assumptions. First, defendant assumes that the five employees who retired when Bellmont filed for bankruptcy would have retired at that time if Bellmont had stayed in business and that Bellmont would not have hired new employees to replace the retiring ones. Second, defendant assumes that the employers who hired the other three former Bellmont employees would not have hired different persons for those three positions if Bellmont had stayed in business.

ing made. If an employer goes out of business and its operations cease, presumptively at least, the total number of jobs with respect to which contributions are being made is reduced, regardless whether some or all the former employees of the defunct employer find employment in other covered enterprises. This presumptive loss of jobs overall would seem to be the economically relevant factor that supplies the rationale for withdrawal liability. But this presumption should not attach merely because a covered enterprise changes its name, its ownership or its structure while its operations are carried on generally intact (which are the circumstances addressed by the statutory exceptions). Thus Congress could rationally intend to impose withdrawal liability when an employer goes out of business, but not in the situations covered by section 1398 or section 1301(b).

■ Second, even if we could be persuaded that the policy objectives of the MPPAA would not be served by imposing withdrawal liability in this case, we would have to reject the defendant's argument. Congress did not merely select a broad policy goal and instruct the courts to achieve that objective. Rather, Congress itself decided what rules, and exceptions to those rules, would best achieve its goals. The statutory language is the most reliable indicator of congressional intent. *See Monterey Coal v. Federal Mine Safety & Health Review Commission*, 743 F.2d 589, 598 (7th Cir.1984). We have held that "the enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded." *In re Cash Currency Exchange*, 762 F.2d 542, 552 (7th Cir.), *cert. denied sub nom. Fryzel v. Cash Currency Exchange*, — U.S. —, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985). Hence we are bound by the particular rules enacted by Congress and are not free to carve out our own exceptions merely because we believe they would not undermine Congress' goals. Our recent opinion in *United States v. Medico Industries, Inc.*, 784 F.2d 840 (7th Cir.1986) is instructive:

A legislature that seeks to achieve a goal ... can do so in one of two ways. First, it may identify the objective and instruct courts or agencies to design rules to achieve more of that objective. This method permits fine tuning in individual cases at the expense of imprecision and uncertainty in the run of cases. Second, Congress may pick the rules itself and make them the measure of the objective. The selection of the rule denotes what the goal is worth to Congress, how best to achieve that goal, where to stop in pursuit of the goal. See *Mercado v. Calumet Federal Savings & Loan Ass'n*, 763 F.2d 269, 271–72 (7th Cir.1985). Any rule of this character will overshoot in some respects and fall short in others. In other words, it will be overbroad and have loopholes at the same time. Yet a court may not convert a rule into a general standard without reversing the choice Congress made. When Congress chooses the rule rather than the objective, a court must turn aside claims of the sort Medico makes—that its conduct does not undercut the legislature's objective and therefore should be permitted.

*Medico*, at 844–45. The Supreme Court also has recently made similar observations:

The "plain purpose" of legislation, however, is determined in the first instance with reference to the plain language of the statute itself. *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 590, 7 L.Ed.2d 492 (1962). Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard fought compromises. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise

and, in the end, prevents the effectuation of congressional intent.

*Board of Governors of the Federal Reserve System v. Dimension Financial Corporation,* ——— U.S. ———, 106 S.Ct. 681, 688–89, 88 L.Ed.2d 691 (1986).

### III.

 Defendant argues that if withdrawal liability is imposed the Fund will be unjustly enriched. We do not think that there is any unjust enrichment; withdrawal liability has been mandated in this case by a valid statute.[3] In *Johnson v. United States,* 602 F.2d 734, 738–39 (6th Cir.1979), the Sixth Circuit held that the district court could not use its equitable powers to deny enforcement of a mandatory provision of the tax law. The Sixth Circuit then relied upon *Clark v. Barnard,* 108 U.S. 436, 2 S.Ct. 878, 27 L.Ed. 780 (1883), in which the Supreme Court stated:

> Accordingly, where any penalty of forfeiture is imposed by statute upon the doing or omission of a certain act, there courts of equity will not interfere to mitigate the penalty or forfeiture, if incurred, for it would be in contravention of the direct expression of the legislative will.... [A] court of equity ha[s] no right to interfere, and, by injunction or decree, to virtually repeal the express provisions of a positive statute, or defeat their operation in the particular case.

108 U.S. at 457, 2 S.Ct. at 890. In any event, as we have noted above, we think Congress's choice of exceptions appears rational in terms of which events affecting an employer would be likely to impair the economic base of the Plan and which would not.

For the reasons stated above we affirm the district court's grant of summary judgment to the plaintiff.

AFFIRMED.

3. The Supreme Court has recently decided that the withdrawal liability provisions of the MPPAA are valid under the clause of the fifth amendment that forbids the taking of private property for public use without just compensation. *Connolly v. Pension Benefit Guaranty Corp.,* ——— U.S. ———, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986).