**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, a pension trust, and Howard McDougall, trustee, Plaintiffs,**

v.

**MIDWEST MOTOR EXPRESS, INC., MME, Inc., Midnite Express, Inc. and Express Cartage, Inc., North Dakota corporations, Defendants.**

No. 94 C 2561.

United States District Court,
N.D. Illinois,
Eastern Division.

March 30, 1998.

James P. Condon, Des Plaines, IL, for Plaintiffs Central States, Southeast and Southwest Areas Pension Fund, and Howard McDougall.

Hervey H. Aitken, Jr., Roy A. Sheetz, Taylor Thiemann & Aitken, L.C., Alexandria, VA, Jeffrey L. Madoff, Matkov, Salzman, Madoff & Gunn, Chicago, IL, for Defendants Midwest Motor Express, Inc., MME, Inc.,

Midnite Express, Inc., and Express Cartage, Inc.

## MEMORANDUM OPINION AND ORDER

ANDERSEN, District Judge.

Plaintiffs bring this action under the Employment Retirement Security Act of 1974, ("ERISA"), 29 U.S.C. § 1001 et seq., as amended by the Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA"), 29 U.S.C. § 1381, et seq. Plaintiffs, Central States, Southeast and Southwest Areas Pension Fund ("Central States") and Howard McDougall, seek to collect withdrawal liability payments from Defendants, Midwest Motor Express, Inc., MME, Inc., Midnite Express, Inc., and Express Cartage, Inc. (collectively "Midwest"), under the terms of the MPPAA. Midwest contends that the MPPAA, as applied, violates the Due Process Clause of the Fifth Amendment of the United States Constitution. ·

Currently before the Court are the parties' cross-motions for summary judgment. Plaintiffs assert that the Court should affirm the withdrawal liability assessment in the principal amount of $2,546,439.30. Although it is well settled that the MPPAA is constitutional on its face, Defendants claim that the instant case raises a matter of first impression in an "as applied" constitutional challenge because it joined Central States before Congress enacted ERISA. For the reasons set forth below, Plaintiffs' motion for summary judgment is granted and Defendants' motion is denied.

### I. BACKGROUND

The following facts, primarily taken from the parties' 12(m) and 12(n) statements, are undisputed unless otherwise noted. Central States is a multiemployer pension plan. Howard McDougall is one of Central States' trustees. Midwest Motor Express, Inc. is a North Dakota corporation. MME, Inc., Midnite Express, Inc., and Express Cartage, Inc. are trades or businesses under Midwest's control. Midwest began contributing to Central States in 1958 and continued to contribute to the plan until it withdrew in 1991. Midwest signed various Trust Agreements

with Central States governing its participation in the plan.

In a multiemployer pension plan, multiple employers contribute to a single pension fund based on one or more collective bargaining agreements. Central States provides pension benefits to participants employed by the employers that have entered into collective bargaining agreements with the International Brotherhood of Teamsters Union (the "Teamsters").

The parties to a collective bargaining agreement set the level of contributions that employers, such as Midwest, are required to pay to Central States. The employer contributions are pooled in one fund and the individual employee-participants do not have separate benefit accounts. Rather, plan participants are promised certain benefits if they achieve the periods of covered employment defined in the plan documents. Thus, Central States is a defined benefit pension plan.

Eight trustees jointly administer Central States, four appointed by management representatives and four appointed by union representatives pursuant to the Taft–Hartley Act, 29 U.S.C. § 186(c)(5). The Trustees determine the level of benefits paid to participants and beneficiaries. Actuaries advise the Trustees on appropriate benefits levels in light of the plan's assets and income. The actuaries also determine the level of contributions necessary to support the benefits disbursed.

The value of the benefits promised to employees is the principal liability of Central States. Central States' vested benefits were valued at $7.206 billion in 1980 and at $12.979 billion in 1991. The assets of Central States have grown from $2.970 billion in 1980 to $11.801 billion in 1991. In 1980 Central States' unfunded vested benefits were $3.744 billion, but by 1991, the unfunded vested benefits were reduced to $1.764 billion.

During the years of Midwest's participation in Central States, the Trustees agreed several times to increase the amount of benefits paid to employees and the level of employer contributions increased several times pursuant to collective bargaining agreements.

Midwest belonged to Regional Carriers, Inc., a regional association of trucking industry employers that conducted multiemployer bargaining with the Teamsters. Midwest appointed Regional Carriers, Inc. as its agent for collective bargaining. Midwest never appointed its own trustee to the Central States Board of Trustees. Rather, Midwest was represented by management trustees appointed by employer associations.

In late 1990, Midwest withdrew from Regional Carriers, Inc. for the express purpose of negotiating a separate 1991–1994 contract as a single employer. Accordingly, Midwest and the Teamsters commenced negotiations for a contract solely between Midwest and the Teamsters. On August 1, 1991, Midwest presented an initial contract offer to the Teamsters. Although Midwest employees went on strike on August 12, 1991, negotiations continued. In October 1991, Midwest legally hired permanent replacements for some of the strikers. On April 15, 1994, the National Labor Relations Board certified Midwest's employees decertification of the Teamsters and the strike ended. Midwest did not participate in the employees' decertification decision.

Between 1958 and 1991, Midwest made all of its required contributions to Central States. Midwest's contribution obligation permanently ceased on April 15, 1994, the day the strike ended. On April 26, 1994, Central States issued to Midwest a notice of assessment of withdrawal liability and a demand for payment of $2,546,439.30. The notice and demand listed Midwest's "pre–1980 pool liability" as $1,814,856.36 and its "post–1979 pool liability" as $731,582.94.

On April 26, 1994, Central States filed suit against Midwest to collect the withdrawal liability in the United States District Court for the Northern District of Illinois. Midwest received Central States' notice and demand on April 27, 1994.

In May 1994, Midwest filed suit against Central States in the United States District Court for the District of North Dakota requesting a declaration that the withdrawal liability was unconstitutional and seeking to enjoin Central States from collecting any interim withdrawal liability payments. Central

States moved to transfer venue to the Northern District of Illinois. The motion was granted. The Eighth Circuit Court of Appeals affirmed the transfer and Midwest unsuccessfully petitioned the United States Supreme Court for certiorari.

Midwest requested arbitration on October 4, 1994. On September 24, 1996, the parties agreed that Midwest would make interim payments of $31,000 per month. Midwest has made all required monthly payments.

Arbitrator Malcolm Pritzker held hearings on January 14–15, 1997. The parties agreed that Arbitrator Pritzker would answer certain stipulated factual questions. Midwest never disputed the actuarial soundness of the withdrawal liability assessment. Instead, Midwest claimed that the withdrawal liability is unconstitutional as applied and, therefore, it owes nothing. Accordingly, at the hearing Midwest offered no testimony to dispute the amount of the withdrawal liability claimed by Central States. In addition, Midwest offered no evidence to quantify the amount of any withdrawal liability attributable to Midwest's pre-ERISA, i.e., pre–1974, participation in Central States. Midwest also proffered no evidence to quantify any alleged impact that the benefits increases had on Midwest's withdrawal liability or Central States' unfunded vested benefits level generally.

Arbitrator Pritzker issued his Decision and Award on May 20, 1997 finding that:

1. Midwest is a pre-ERISA employer in that it started to participate in the Central States Pension Fund in 1958 well prior to the passage of ERISA in 1974. Midwest continued to participate in the fund after the passage of ERISA until it withdrew from the fund.

2. Midwest's withdrawal from Central States was involuntary.

3, 5, 5A, 5B. Central States is not a hybrid Taft–Hartley pension plan within the meaning of ERISA or a defined contribution plan. Central States is a defined benefit pension plan and is therefore covered by Title IV of ERISA. Central States is a hybrid plan as that phrase is used by Justice O'Connor in *Connolly [v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 232–236, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (O'Connor, J., concurring]).

4. Midwest had little but some control over the level of contributions, the degree of benefits or other factors that produced unfunded vested benefits for Central States from the period of 1973 to the time [sic] Midwest's withdrawal from Central States.

6. On the basis of the Record before me, it is impossible to conclude that benefit increases by Central States unduly added to Midwest's withdrawal liability.

(Arb.Op., p. 19).

Central States and Midwest now move for summary judgment. Midwest contends that the imposition of withdrawal liability under the MPPAA is unconstitutional as applied to its particular circumstances. Central States disagrees and asserts that Midwest must pay the withdrawal liability in accordance with the MPPAA.

## II. DISCUSSION

### A. Standard Of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Salima v. Scherwood South, Inc.,* 38 F.3d 929, 932 (7th Cir.1994). The moving party bears the burden of demonstrating an absence of evidence to support the position of the nonmoving party, *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 442–43 (7th Cir.1994), and all reasonable inferences are drawn in favor of the party opposing the motion. *Associated Milk Producers, Inc. v. Meadow Gold Dairies, Inc.,* 27 F.3d 268, 270 (7th Cir.1994). The Court, however, is "not required to draw every conceivable inference from the record [in favor of the non-movant]—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991). To avert summary judgment the plaintiff must "do more than simply show there is some metaphysical doubt as to the

material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-movant cannot rely solely on its pleadings and must come forth with evidence showing that a genuine issue of material fact exists for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In making its determination, the court's sole function is to determine "whether there is any material dispute of fact that requires a trial." *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). Credibility determinations and weighing evidence are jury functions, not those of a judge when deciding a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Even though the parties have filed cross motions for summary judgement, the court need not grant summary judgment for one side. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt,* 700 F.2d 341, 349 (7th Cir.1983), *cert. denied,* 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983); *Intermatic Inc. v. Toeppen,* 947 F.Supp. 1227, 1232 (N.D.Ill.1996). The court must still assess whether a material fact question exists. *Id.*

The arbitrator's factual findings are presumed correct and are rebuttable only by a clear preponderance of the evidence. His resolution of "mixed questions of fact and law" are also entitled to deference. 29 U.S.C. § 1401(c); *Central States, Southeast and Southwest Areas Health and Welfare Fund v. Cullum Companies,* 973 F.2d 1333, 1337 (7th Cir.1992). We review the arbitrator's legal determinations de novo. *Id.*

### B. Jurisdictional Issues

**1. This Court Has Jurisdiction Over Central States' Lawsuit**

Midwest rehashes its previously rejected argument that this Court lacks subject matter jurisdiction over Central States' lawsuit. Midwest asserts that Central States filed its lawsuit before Midwest refused to pay the withdrawal liability assessed in the notice and demand. Thus, Midwest contends that Central States' claims were legally non-existent at the time it filed suit and, therefore, this Court never acquired jurisdiction. The Eighth Circuit previously rejected this same argument and held that this Court had subject matter jurisdiction over Central States claims. The court held:

> Midwest thus asks this court to weigh the merits of the Illinois action in order to determine whether that forum has jurisdiction. But this is a non sequitur. 'A court may have jurisdiction over a case even though the case is one to which there is no merit.... The jurisdiction of the federal courts is dependant on the subject matter if the action or the status of the parties to it; it is not dependent on the merits of the case.'

*Midwest Motor Express, Inc. v. Central States Southeast and Southwest Areas Pension Fund,* 70 F.3d 1014, 1017 (8th Cir.1995) (citing Charles A. Wright, Law and Federal Courts 31 (5th ed.1994)), *cert. denied,* 517 U.S. 1203, 116 S.Ct. 1704, 134 L.Ed.2d 803 (1996). Likewise, this Court similarly rejected Midwest's argument. (*See* Transcript of February 22, 1996 Hearing).

Moreover, Midwest's North Dakota lawsuit is currently before this Court and also concerns the propriety of the withdrawal liability assessed in the notice and demand issued by Central States. Neither party disputes that this Court has jurisdiction over the North Dakota action. Indeed, Midwest filed the North Dakota action *after* it received the notice and demand and *after* Midwest refused to pay its outstanding withdrawal liability by filing its own lawsuit challenging the constitutionality of the assessment. *See Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.,* ―― U.S. ――, ――, 118 S.Ct. 542, 549, 139 L.Ed.2d 553 (1997).

Additionally, Midwest contends that Central States' action did not accrue until after the arbitrator issued his decision. Midwest is wrong. Although arbitration under the MPPAA, 29 U.S.C. § 1401, is mandatory, the requirement is not a jurisdictional prerequisite. *McDonald v. Centra, Inc.,* 946 F.2d 1059, 1063 (4th Cir.1991), *cert. denied,* 504 U.S. 968, 112 S.Ct. 2325, 119 L.Ed.2d 244 (1992). Therefore, the Court will not dismiss

Central States' claims for lack of subject matter jurisdiction.

### 2. Midwest's Challenge To The Withdrawal Liability Assessment Is Not Time Barred

■ Central States argues that Midwest's challenge to the withdrawal liability assessment is barred because Midwest did not file a timely challenge to the arbitrator's ruling. Under 29 U.S.C. § 1401(b)(2), either party may bring an action to enforce, modify, or vacate the arbitrator's award and any objections to the arbitrator's award are waived if not timely filed.

In its Second Amended Complaint, Central States added a claim to enforce and/or modify the arbitrator's award and Midwest filed its timely answer and affirmative defenses. Midwest is not challenging the arbitrator's award nor the actuarial propriety of the assessed withdrawal liability. Thus, Midwest did not have to file a pleading pursuant to 29 U.S.C. § 1401(b)(2) in order for this Court to have jurisdiction over Midwest's constitutional claim.

Furthermore, because Midwest challenges the constitutionality of the MPPAA as applied to its circumstances, the arbitrator was not asked to and did not reach the actuarial propriety of the withdrawal assessment. Rather, he made findings of fact to questions presented by stipulation of the parties. The arbitrator's award, therefore, provides the factual underpinnings to Midwest's constitutional claim. The arbitrator did not decide, nor could he decide, the merits of Midwest's constitutional challenge to the withdrawal liability assessment. Thus, Midwest's constitutional claim is properly before this Court.

### C. The MPPAA As Applied To Midwest

#### 1. Background On The MPPAA

Congress enacted ERISA in 1974 to " 'ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in [them].... Congress wanted to guarantee that if a worker had been promised a defined benefit pension upon retirement—and if he obtained a vested benefit— he would actually receive it.' " *Concrete Pipe and Products of Cal., Inc. v. Construc-tion Laborers Pension Trust for Southern Cal.,* 508 U.S. 602, 607, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (citation omitted). Initially, ERISA did not unconditionally guarantee multiemployer pension plans because Congress viewed multiemployer plans as more stable and secure than single employer plans. *Peick v. Pension Benefit Guaranty Corp.,* 724 F.2d 1247, 1252 (7th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984). Accordingly, multiemployer plans were guaranteed solely at the discretion of the Pension Benefit Guaranty Corporation ("PBGC") until January 1, 1978. "In the interim, the PBGC determined on a case-by-case basis whether it would pay a terminating plan's beneficiaries the difference between the value of their guaranteed benefits and the value of the plan's assets on the termination date." *Id.*

In the late 1970's, Congress determined that "the possibility of liability upon termination of a plan created an incentive for employers to withdraw from weak multiemployer plans." *Concrete Pipe,* 508 U.S. at 608. Based on its concern for the financial stability of multiemployer plans, Congress requested that the PBGC investigate and report on multiemployer plans. *Id.* The PBGC suggested new rules that would require a withdrawing employer to pay its share of the plan's unfunded liabilities attributable to that employer's participation in the plan. *Connolly,* 475 U.S. at 216. In response, Congress enacted the MPPAA on September 26, 1980 but established April 29, 1980 as the effective date of its withdrawal liability provisions. 29 U.S.C. § 1461(e)(2)(A).

The MPPAA changed the rules governing an employer's withdrawal from a multiemployer plan. No longer did an employer's withdrawal "give rise, as it had under ERISA, to a contingent liability payable to the PBGC. Under [the] MPPAA, an employer who withdraws must immediately begin to pay a fixed and certain debt owed to the plan." *Peick,* 724 F.2d at 1255. The MPPAA provides that "[i]f an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in an

amount determined under this part to be the withdrawal liability." 29 U.S.C. § 1381(a). A complete withdrawal from a multiemployer plan occurs "when an employer—(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383. It is undisputed that Midwest's obligations to contribute to Central States permanently ceased when the employees of Midwest decertified the Teamsters.

When an employer, such as Midwest, withdraws from a multiemployer plan, it is liable for its proportionate share of the plan's unfunded vested benefits. 29 U.S.C. §§ 1381, 1391. The employer's share of the unfunded vested benefits is measured by the difference between the current value of the plan's assets and the present value of the vested benefits. The vested benefits are the "benefits that are currently being paid to retirees and that will be paid in the future to covered employees who have already completed some specific period of service." *Concrete Pipe*, 508 U.S. at 609 (citing 29 U.S.C. §§ 1053, 1381, 1391).

Under the MPPAA, the trustees of a multiemployer plan are responsible for determining whether an employer has withdrawn and, if so, determining the amount of the employer's withdrawal liability, notifying the employer of the amount of that liability, and collecting that amount from the employer. 29 U.S.C. § 1382. All disputes concerning the amount of an employer's withdrawal liability must be resolved through arbitration. 29 U.S.C. § 1401(a)(1). Because the withdrawing employer must "pay now and dispute later," the employer must make the contested withdrawal liability payments pending resolution of the dispute through arbitration. 29 U.S.C. § 1401(d); *see Bay Area Laundry and Dry Cleaning Pension Trust Fund*, 118 S.Ct. at 547. Any party to the arbitration may file an action in the appropriate district court to review the arbitrator's decision. 29 U.S.C. § 1401(b)(2).

### 2. Substantive Due Process Standard Of Review

■ The MPPAA is a classic example of an economic regulation, a legislative effort to structure and accommodate the burdens and benefits of economic life. · *See Pension Bene-*

*fit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. at 728; *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). A party challenging economic legislation on substantive due process grounds faces a difficult uphill climb. Indeed, since 1935 the Supreme Court has not invalidated any federal economic regulation on substantive due process grounds.

■ Because the MPPAA is an economic regulation that burdens no fundamental rights, it is subject to the minimum scrutiny, rational basis test. *R.A. Gray & Co.*, 467 U.S. at 729. "It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Id.; see also Usery*, 428 U.S. at 15. Although economic legislation must be rational and not arbitrary, Congress is not obligated to select a legislative scheme that a court would later find to be the fairest means to the legislative end, but simply one that is rational and not arbitrary. *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 477, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985).

■ Moreover, legislation adjusting economic rights and burdens is not unlawful solely because it upsets otherwise settled expectations. This is true even if the legislation imposes a new duty or liability based on past acts. *R.A. Gray & Co.*, 467 U.S. at 729–730. Nonetheless, the retroactive aspects of the legislation must satisfy due process. *Id.* at 730. "The burden to justify retroactivity in economic legislation 'is met simply by showing that the retroactive application is itself justified by a rational legislative purpose.'" *Davon, Inc. v. Shalala*, 75 F.3d 1114, 1123 (7th Cir.) (quoting *R.A. Gray & Co.*, 467 U.S. at 730), *cert. denied sub nom., Templeton Coal Co., Inc. v. Shalala*, — U.S. ——, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996).

The main thrust of Midwest's argument is that the MPPAA is unconstitutional as applied because the statute imposes a retroactive liability that Midwest never agreed to assume and never anticipated. Midwest ex-

clusively relies on Justice O'Connor's concurrences in *Connolly* and *Concrete Pipe* in which she opined that the MPPAA *might* be unconstitutional as applied to certain employers. Significantly, other than Justice Powell who joined in the *Connolly* concurrence, no court has adopted the rationale contained in Justice O'Connor's concurrences. In any event, even if Midwest satisfied all of Justice O'Connor's criteria, it is uncertain that Justice O'Connor would find for Midwest.

Specifically, Midwest contends that its facts and circumstances address all of Justice O'Connor's concerns and "present the best constitutional argument available: The imposition of withdrawal liability under the MPPAA (1) on a pre-ERISA employer, (2) who had no contractual obligation to pay benefit levels, and (3) who had paid all its pension contributions, (4) for an involuntary withdrawal (5) from a hybrid Taft–Hartley Plan (6) where there has been no detriment to the participants and retirees, and (7) where the employer has little control over the level of contributions, the degree of benefits or other factors that produce unfunded vested benefits for the Plan, is so arbitrary and irrational as to violate the due process clause of the Fifth Amendment." (Def. Mem. in Support of SJ, pp. 3–4).

### 3. Involuntary Withdrawals

#### a. The MPPAA Applies To Involuntary Withdrawals

■ Arbitrator Pritzker held that Midwest's withdrawal from Central States was involuntary. (Arb.Op., pp. 14, 19). Thus, Midwest contends that "[i]t is contrary to the intent of Congress to require Midwest to pay withdrawal liability because Midwest itself took no action to effectuate the withdrawal from Central States." (Def. Mem. in Support of SJ, p. 16). Nonetheless, this fact offers no aid to Midwest because the MPPAA does not exempt involuntary withdrawals from liability.

■ First, we must examine the language of the statute, the most reliable indicator of Congressional intent. *Central States, Southeast and Southwest Areas Pension Fund v. Bell Transit Co.*, 22 F.3d 706, 710 (7th Cir.1994). The court must ensure that the plain language of the statute is applied and not bypassed. *Id.* "Congress, not the

courts, decides what rules and exceptions to those rules best achieve its goals." *Central States Southeast and Southwest Areas Pension Fund v. Bellmont Trucking Co., Inc.*, 788 F.2d 428, 433 (7th Cir.1986). "The enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded." *In re Cash Currency Exchange*, 762 F.2d 542, 552 (7th Cir.), *cert. denied sub nom., Fryzel v. Cash Currency Exchange*, 474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985).

Midwest admits that the language of the MPPAA is clear and unambiguous. A review of the MPPAA's provisions establishes that the statute contains no express exemption for involuntary withdrawals. The MPPAA, however, carves out specific exceptions to the generally applicable rule, 29 U.S.C. § 1381(a), imposing liability on an employer withdrawing from a pension plan. For example, 29 U.S.C. § 1398 precludes withdrawal liability if an employer ceases to exist due to specified changes in corporate structure or if an employer suspends contributions during a labor dispute. Other exceptions are listed in 29 U.S.C. §§ 1383(b)–(d) (exceptions for construction and entertainment industry) and 1384 (sale of assets). Because Congress has mandated no such exemption, the Court cannot carve out an exception for involuntary withdrawals or for withdrawals occasioned by the employees' decertification of their union. *See Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 680 (7th Cir.1997); *Bellmont Trucking Co., Inc.*, 788 F.2d at 433.

■ Correctly, Midwest does not contend that it meets any of the enumerated exceptions to withdrawal liability. Instead, Midwest asserts that because it did not "voluntarily" withdraw to gain economic advantage, but rather withdrew because its employees decertified the Teamsters, Congress intended no withdrawal liability. We disagree.

Midwest cites the testimony of several witnesses appearing before the pertinent House and Senate committees who urged lawmakers to tailor the MPPAA to regulate only *voluntary* withdrawals. For the same proposition, Midwest cites Senator Dole's statement that "it is imperative that this bill

provide protections for employers, especially smaller employers, so that they will not be irreparably damaged by events over which they have no control." 126 Cong. Rec. 20181 (1980). Midwest, however, ignores the context of Senator Dole's statement. The Senator was not referring to involuntary withdrawals. Rather, he called for safeguards to ensure the proper calculation of the withdrawing employer's share of the unfunded vested benefits because "in many multiemployer plans it is impossible to trace the unfunded liability attributable to each employer." *Id.* Significantly, Midwest fails to cite any *Congressional* debate discussing any legislator's desire or requirement that involuntary withdrawals be exempted from liability.

■ The MPPAA's legislative history states that "[t]he primary purpose of the legislation is to protect retirees and workers who are participants in such plans against the loss of their pensions." H.R. REP. 96–869(I)a, reprinted in 1980 U.S.C.C.A.N. 2918, 2919. Moreover, "Congress was concerned not only with reducing incentives to withdraw from multiemployer plans, but also with offsetting 'the burden otherwise shifted to the remaining employers when a withdrawal nevertheless occurs.'" *Bellmont Trucking Co., Inc.*, 788 F.2d at 432 (rejecting employer's argument that the MPPAA did not apply to involuntary withdrawal caused by employer's bankruptcy). Additionally, Congress did not intend withdrawal liability to attach as a punishment for a withdrawing employer's malice or willfulness, but to protect the vested pension interests of the employees. *See* 29 U.S.C. § 1001(c). Indeed, "[i]f employers escaped liability merely because their withdrawals were involuntary, a major protective feature of the MPPAA would be undercut." *Board of Trustees of the Western Conference of Teamsters Pension Trust Fund v. Thompson Bldg. Materials, Inc.*, 749 F.2d 1396, 1407 (9th Cir.1984) (union forced withdrawal subjected employer to withdrawal liability), *cert. denied*, 471 U.S. 1054, 105 S.Ct. 2116, 85 L.Ed.2d 481 (1985). When a withdrawing employer is assessed its withdrawal liability, the pension plan is essentially billing the employer for its fair share of the plan's under funding. "Congress therefore chose withdrawal liability as a means to both deter

withdrawals and to make the employer liable for any damage caused by the withdrawal." *Keith Fulton & Sons, Inc. v. New England Teamsters and Trucking Indus. Pension Fund*, 762 F.2d 1124, 1130 (1st Cir.1984).

Had Congress wanted to limit the reach of the MPPAA to voluntary withdrawals, such a restriction could have easily been included in the statute. Although Midwest relies on witnesses supporting liability exclusively for voluntary withdrawals, Congress did not. Simply put, nothing in the pertinent legislative history suggests that Congress intended to exclude involuntary withdrawals from the purview of the MPPAA. *See* H.R.Rep. No. 96–364 (1980), *reprinted in* 1980 U.S.C.C.A.N. 2918. *Accord Thompson Bldg. Materials, Inc.*, 749 F.2d at 1407 (stating "at the outset we note that many, if not most, employer withdrawals are involuntary to some degree, but no appellate court has found that factor relevant"); *Centennial State Carpenters Pension Trust Fund v. Woodworkers of Denver, Inc.*, 615 F.Supp. 1063, 1068 (D.Colo.1985) (granting summary judgment for the pension plan even though the employer's withdrawal was occasioned by the employees' decertification of their union); *Pacific Iron & Metal Co. v. Western Conference of Teamsters Pension Trust Fund*, 553 F.Supp. 523, 526 (W.D.Wash.1982) (the MPPAA does not exclude involuntary withdrawal due to employees' vote to decertify their union).

Congress also directed the PBGC to conduct a study and report on "the necessity of adopting special rules in cases of union-mandated withdrawal from a multiemployer pension plan." Multiemployer Pension Plan Amendments Act of 1980 § 412(a)(1)(B), Pub.L. 96–364 (codified at 29 U.S.C. § 1306). The Report defined union-mandated withdrawals as "an event that is triggered by a union's conduct." (Union–Mandated Withdrawal Study Report, *submitted by the Pension, Benefit Guaranty Corporation*, March 1991, hereinafter "Report," p. 11). Although union conduct did not trigger Midwest's withdrawal, the report is instructive on the MPPAA's treatment of involuntary withdrawals.

The Report notes that "[a]llowing all 'involuntarily' withdrawing employers to escape liability, in whole or in part, shifts the consequences of underfunding solely onto other employers and participants. Remaining employers would be forced to carry added funding burdens themselves, a fact that could create serious economic hardships and eventually force more employer withdrawals." (Report, pp. 10–11). Additionally, the Report states that withdrawal liability serves to protect "the financial integrity of multiemployer plans." Consistent with this purpose, Congress chose in 1980 to base the general withdrawal liability rules on events that normally result in a loss of the plan's contribution base and potentially harm the plan's integrity, rather than to make rules that were based on fault or subjective factors. (Report, pp. 18–19). The PBGC recommended that the Congress make no statutory modifications to accommodate union mandated withdrawals. (Report, p. 25). Consistent with the Report, Congress has not amended the MPPAA to exempt union mandated withdrawals from withdrawal liability.

■ Thus, we conclude that Congress did not intend to exempt from the MPPAA employers, such as Midwest, that withdraw from a pension plan because their employees decertify their union. Furthermore, based on the MPPAA's express purpose and the legislative history, we find that Congress' decision to impose liability on employers for voluntarily and involuntarily withdrawals is rational and not arbitrary.

#### b. The MPPAA As Applied To Midwest Is Constitutional Even Though Its Withdrawal Was Involuntary

■ Midwest also contends that imposition of withdrawal liability violates its due process rights because it had no control over the union decertification which caused Midwest's withdrawal. Although Arbitrator Pritzker specifically held that Midwest's withdrawal from Central States was involuntary, (Arb.Op. pp., 14, 19), he did not discuss the chain of events leading up to decertification. Moreover he expressly "le[ft] to the Court the issue not before me of whether [Midwest's] conduct in this case falls within the employer's conduct described by Justice O'Connor in *Connolly*, [475 U.S. at 229 ]

when she wrote: " '. . . the imposition of retroactive liability on employers for the benefit of employees may be arbitrary and irrational in the absence of any connection between the employer's conduct and some detriment to the employee.' " (Arb.Op., p. 14). Thus, we now turn to the facts and circumstances leading to the decertification of the Teamsters.

Although the underlying facts are uncontested, the parties dispute whether, as a matter of law, Midwest had sufficient control over the events culminating in the decertification to withstand Midwest's constitutional challenge. Midwest did not, and could not, directly participate in the decertification decision. Nevertheless, as a matter of law, we find that Midwest exercised sufficient influence and control over the chain of events that culminated in the decertification.

In late 1990, Midwest chose to leave its employer association and negotiate a contract on its own with the Teamsters. Although the negotiations continued, Midwest's employees went on strike. Midwest's offers and tactics during the ensuing negotiations likely led to, or perhaps prolonged, the strike. Moreover, Midwest hired the replacement workers that, through no action of Midwest, chose to decertify the Teamsters. Midwest also refused to displace the permanent replacement workers for the striking employees, a significant issue for the Teamsters. (Arb.Op., p. 4).

Furthermore, regardless of the reason Midwest withdrew from Central States, Midwest's failure to pay its fair share of unfunded vested benefits would force the employers remaining in the plan to shoulder an extra burden. This result is contrary to the express purpose of the MPPAA. 29 U.S.C. §§ 1001(c), 1001a(c).

We agree with Midwest that its withdrawal from Central States was involuntary in that the decertification caused Midwest's contribution obligation to cease. Nonetheless, because, as a matter of law, Midwest had sufficient influence or control over the events leading up to the decertification, the imposition of withdrawal liability passes constitutional muster. As such, the imposition of

withdrawal liability on Midwest is not arbitrary or irrational.

### 4. Midwest's Status As A Pre–ERISA And Pre–MPPAA Employer Does Not Negate The Constitutionality Of Its Withdrawal Liability

■ Midwest claims that its withdrawal liability is unconstitutional because "Midwest joined Central States before it could possibly have anticipated withdrawal liability." (Def. Mem. in Support of SJ, p. 22). Midwest relies on Justice O'Connor's *Concrete Pipe* concurrence in which she wrote:

> the Court's opinion should not be read to imply that employers may be subjected to retroactive withdrawal liability simply because 'pension plans have long been subject to federal regulation.' Surely the employer that joined a multiemployer plan before ERISA had been promulgated—before Congress had made employers liable for unfunded benefits—*might* have a strong constitutional challenge to retroactive withdrawal liability.

*Id.* 508 U.S. at 649 (O'Connor, J., concurring) (emphasis added). Relying on this rationale, Midwest asserts that ERISA "radically changed the legal relationship among Central States and its contributing employers such as Midwest." (Def. Mem. in Support of SJ, p. 23). Because it allegedly had no control over the statutory rules that changed its obligations to Central States, Midwest argues that it "had no meaningful opportunity in 1974 to avoid the obligations of ERISA and, short of economic suicide, no opportunity to avoid the additional obligations imposed by the MPPAA in 1980." (*Id.*). As discussed below, the case law undermines Midwest's contentions.

■ It is well settled that "whether or to what extent a particular piece of legislation dashes a parties' economic 'expectations' generally poses no constitutional impediment since all economic legislation—whether labeled prospective or retroactive—inherently disrupts someone's financial expectations." *Templeton Coal Co., Inc. v. Shalala*, 882 F.Supp. 799, 814 (S.D.Ind.1995), *Davon, Inc. v. Shalala,* 75 F.3d 1114, 1123 (7th Cir.), *cert. denied, Templeton Coal Co., Inc. v. Shalala,* — U.S. ——, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996). Midwest joined Central States in 1958, 16 years before Congress enacted

ERISA and 22 years before the MPPAA. Although Midwest may not have anticipated the prospect of withdrawal liability in 1958, "pension plans . . . were the objects of legislative concern long before the passage of ERISA in 1974." *Connolly,* 475 U.S. at 226–227. *Accord R.A. Gray & Co.,* 467 U.S. at 732. Indeed, multiemployer plans have been subject to federal control since 1947. *Board of Trustees of the Western Conference of Teamsters Pension Trust Fund v. J.N. Ceazan,* 559 F.Supp. 1210, 1214 (N.D.Cal.1983).

Moreover, Midwest voluntarily chose to continue participating in Central States after ERISA altered the pension plan landscape. In 1974, ERISA required a withdrawing employer to pay a contingent liability up to 30% of its net worth. *Concrete Pipe,* 508 U.S. at 646; *see* 29 U.S.C. §§ 1362(b), 1364 (1976 ed.). Moreover, "in 1974 . . . it was clear that if the PBGC exercised its discretion to pay benefits upon termination of a multiemployer pension plan, employers who had contributed to the plan during the preceding five years were liable for their proportionate share of the plan's contributions during that period." *Connolly,* 475 U.S. at 227. Because Midwest remained in Central States after ERISA was enacted, Midwest could have "no reasonable expectation that the legislative ceiling would never be lifted" or "that it would not be faced with liability for promised benefits." *See Concrete Pipe,* 508 U.S. at 646; *Connolly,* 475 U.S. at 227. Furthermore, Midwest presents no evidence to show which portion of its total withdrawal liability, if any, is attributable to its pre-ERISA participation in Central States. (Arb.Op., pp. 14–15).

Additionally, once Congress learned that ERISA failed sufficiently to guarantee that employees would receive the pension benefits promised to them by employers, Congress enacted the MPPAA. At that time "[p]rudent employers . . . had more than sufficient notice not only that pension plans were currently regulated, but also that withdrawal itself might trigger additional financial obligations." *Connolly,* 475 U.S. at 227. Thus, Midwest chose to do business in a regulated field and " 'cannot object if the legislative scheme is buttressed by subsequent amend-

ments to achieve the legislative end.'" *Connolly*, 475 U.S. at 227 (citation omitted).

Although Midwest exercised no control over Congress, it exercised complete control over its decision to continue participating in Central States and the collective bargaining agreements which required contributions to a multiemployer plan. Significantly, Arbitrator Pritzker acknowledged that even though it may have been "economic[] suicid[e]," Midwest could have withdrawn from bargaining and from the plan. (Arb.Op., pp. 17–18). Notwithstanding ERISA and the MPPAA, Midwest determined that remaining a party to the collective bargaining agreements and, thus, a contributor to Central States, best served Midwest's interests. (Arb.Op., p. 17). Additionally, "several times after the passage of ERISA and [the] MPPAA [Midwest] ratified all decisions of the joint union-management trustees." (Arb.Op., p. 13). Thus, like a Faustian pact, Midwest voluntarily chose to accept the additional economic burdens imposed by ERISA, and later the MPPAA. Therefore, Midwest cannot now complain that it is not accountable for its choices.

▄▄ Midwest also argues that the "sum total of Midwest's responsibility to Central States was to pay the collectively bargained rate for covered employees on time and in full," and that "at no time did Midwest ever agree to ensure that the benefits of Central States would be fully funded." (Def. Mem. in Support of SJ, p. 6). This argument presumes that the Due Process Clause prohibits Congress from imposing obligations beyond those voluntarily assumed by contract. Midwest's assumption is erroneous. *See Davon, Inc.*, 75 F.3d at 1125.

"In rejecting a due process challenge to the retroactive withdrawal liability provision of the MPPAA, the Supreme Court in *R.A. Gray & Co.* stated that 'legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations' and that 'this is true even though the effect of the legislation is to impose a new duty or liability based on past acts.'" *Id.* Accordingly, Midwest's contractual obligations under the Trust Agreements and collective bargaining agreements "in no way define the outer limit of Congresses' power to legislate consistently with the Due Process Clause." *Id.*

Congress' decision to require employers, like Midwest, to fund the pension benefits they offered to their employees is neither irrational nor inequitable. Midwest obtained economic benefits from participating in Central States. The pension benefits undoubtedly attracted experienced employees who chose to work for Midwest rather than for another employer not participating in Central States. Moreover, experienced Midwest employees may have chosen to remain working for Midwest based on the offered pension benefits. Therefore, compelling Midwest to bear responsibility for meeting its employees' legitimate expectations to receive a pension at retirement is constitutional. "At the time of its withdrawal, [Midwest] had fully received its benefits from offering the pension, but its employees had not received full payment for their services." *Thompson Bldg. Materials, Inc.*, 749 F.2d at 1402. Midwest's employees rely and depend upon the existence of a solvent pension plan at their retirement. Thus, extending Midwest's responsibility beyond its contractual promises to ensure that the goals of ERISA and the MPPAA are satisfied is rational and not arbitrary. Accordingly, the imposition of withdrawal liability for the time period before passage of the ERISA and the MPPAA is not so harsh or oppressive as to violate Midwest's Fifth Amendment rights.

## 5. Midwest Exerted Sufficient Control Over The Factors Affecting Its Withdrawal Liability

▄▄ Midwest claims that "there has been a retroactive imposition of liability on [it] for the asserted benefit of employees without any connection between Midwest's conduct and any harm to the employees and beneficiaries of the Plan." (Def. Mem. in Support of S.J., p. 22). Again Midwest relies on Justice O'Connor's *Connolly* concurrence in which she wrote: "[o]ur recent cases leave open the possibility that the imposition of retroactive liability on employers for the benefit of employees may be arbitrary and irrational in the absence of any connection between the employer's conduct and some detriment to the employee." *Connolly*, 475 U.S. at 228–229 (O'Connor, J., concurring). Central States argues that Midwest sufficiently exercised control over the factors affecting its

withdrawal liability to remove Midwest from the concerns expressed by Justice O'Connor. We agree with Central States.

Arbitrator Pritzker found that "through its authorized Employer Association bargaining agent, Midwest had *some level of control* over the level of contributions." (Arb Op., p. 17) (emphasis added). He also held that, "[t]hrough the employer trustees, Midwest had *some level of control* over the benefits and other factors that impacted on unfunded benefit liabilities and therefore Midwest's withdrawal liability in that the Employer Trustees as prudent men and women did not have to agree to any benefit improvement or other factors which would have increased Employer Withdrawal Liability." (*Id.*) (emphasis added).

Midwest properly points out that it had no control over the decisions rendered by the Central States Trustees because the they must act for the exclusive benefit of the employee beneficiaries rather than as agents of the employers or the union. *NLRB v. Amax Coal Co.*, 453 U.S. 322, 331–332, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981). Nonetheless, Midwest repeatedly signed Trust Agreements in which Midwest agreed to be bound by the decisions of the Trustees. (Arb.Op., pp. 3, 17). Rather than disputing this fact, Midwest merely offers the unsupported conclusion that the agreements were "models of contracts of adhesion" (Def. Mem. in Opp. to Pls. Motion for SJ, p. 10).

Additionally, Midwest presented no actuarial evidence to the arbitrator challenging the benefits decisions or any other decisions rendered by the Trustees. The arbitrator's factual conclusions are entitled to deference. We find that Midwest has not presented evidence that the arbitrator's factual conclusions were clearly erroneous. *See* 29 U.S.C. § 1401(c). Therefore, we concur with the Arbitrator Pritzker's finding that the Trustees' actions did not "unduly" add to Midwest's withdrawal liability. (Arb. Op., pp. 17–18). Accordingly, we find, as a matter of law, that Midwest failed to meet its burden to show which portion of the withdrawal liability, if any, resulted from the Trustees' decisions.

Moreover, Midwest exercised sufficient control over the level of contributions, the collective bargaining process, and other factors affecting Central States' unfunded vested benefit liabilities to satisfy the lenient rational basis test. Midwest voluntarily chose to appoint an employer association to handle its collective bargaining and knew that the contracts negotiated on its behalf were binding. Significantly, Midwest admits that the collective bargaining agreements as negotiated by the union and employer associations, set the levels of contributions paid by employers. (Def. Reply in Support of SJ, p. 19). Additionally, if Midwest was displeased with the terms of the collective bargaining agreements negotiated by its employer association, Midwest could have withdrawn from the association, as it did in late 1990, and negotiate on its own behalf. Thus, as a matter of law, we find that Midwest exercised little, but sufficient meaningful control over the contribution levels it was required to pay, a factor affecting Central States' unfunded vested benefits.

Midwest further relies on Arbitrator Pritzker's determination that Central States is a "hybrid" Taft–Hartley plan in the manner used by Justice O'Connor in her *Connolly* concurrence. (Arb.Op., p. 16). According to Justice O'Connor:

> Taft–Hartley plans are the product of joint negotiation between employers and a union and are administered by trustees nominated in equal numbers by employers and the union. . . . most Taft–Hartley plans 'possess the characteristics of both fixed contributions and fixed benefits. . . . Under these hybrid Taft–Hartley plans it is the plans' trustees not the employers and the union, who are 'usually responsible for determining the types of benefits to be provided . . . and the level of benefits, although in some cases these are set in the collective bargaining agreement.'

*Connolly*, 475 U.S. at 233 (O'Connor, J., concurring) (citations omitted). Based on her analysis of hybrid plans, Justice O'Connor opined that:

> . . . whatever promises a collectively bargained plan makes with respect to benefits may not always be rationally traceable to the employer's conduct and that it may sometimes be quite fictitious to speak of

some plans as 'promising' benefits at a specified level, since to do so ignores express and bargained for conditions on those promises. Where the plan's fixed contribution aspects were agreed to by employees through their exclusive bargaining representatives, and *where employers had no control over the level of benefits promised,* employer responsibility for the benefits specified by the plan is very much attenuated, and employee expectations that these benefits will in all events be paid, in the face of plain language to the contrary, are not easily traceable to the employer's conduct.

*Connolly,* 475 U.S. at 235 (O'Connor, J., concurring) (emphasis added).

Although Midwest is a hybrid Taft–Hartley plan as contemplated by Justice O'Connor, Midwest's circumstances fall outside Justice O'Connor's constitutional concerns. Justice O'Connor was concerned with employers who had "no control over the level of benefits promised." *Id.* Because Midwest exercised some control over the factors affecting its withdrawal liability, application of the MPPAA is rational and not arbitrary.

Again relying on Justice O'Connor's *Connolly* concurrence, Midwest contends that its withdrawal caused no harm to active or retired participants because the assets held by Central States have grown while its unfunded vested benefits level has decreased from 1980 to 1991. In 1991, the assets of Central States totaled $11.801 billion and its unfunded vested benefits totaled $1.764 billion.

■ Although Central States successfully decreased its unfunded vested benefits level by the time Midwest withdrew, a significant amount, $1.764 billion, remains. The MPPAA assures that each withdrawing employer pays its proportionate share of the unfunded vested benefits at the time of its withdrawal so that present and future retirees will receive their promised pension benefits. The statute, however, does not exempt an employer from paying its fair share of the unfunded vested benefits because the pension plan is enjoying a period of financial strength. To do so would be contrary to the express purpose of the MPPAA. *See* 29 U.S.C. §§ 1001, 1001a, 1381.

Midwest also states that there is no record evidence demonstrating that any retirees have not received their pension benefits. Even though Midwest's withdrawal caused no immediate harm to current retirees, the imposition of withdrawal liability ensures that the withdrawal does not harm future retirees or future benefits. By paying its withdrawal liability Midwest helps to guarantee, as the MPPAA intended, that Central States' assets are sufficient to meet the present value of the benefits that Central States must pay to Midwest's employees in the future. Moreover, Midwest offers no evidence to establish that its past contributions plus its allocable share of Central States' earnings exceed the present value of all benefits accrued by Midwest's employees, i.e. Midwest's withdrawal liability. *See Connolly,* 475 U.S. at 236 (O'Connor, J., concurring). Accordingly, we find that Justice O'Connor's concerns are not applicable to Midwest.

In sum, Midwest has failed to demonstrate that the MPPAA, as applied, is arbitrary or irrational. Other than Justice O'Connor's concurring opinions in. *Connolly* and *Concrete Pipe,* there is no authority supporting Midwest's arguments. Thus, we find that the imposition of withdrawal liability does not violate Midwest's Fifth Amendment right to substantive due process.

### III. *CONCLUSION*

For the foregoing reasons, we find that the imposition of withdrawal liability under the MPPAA as applied to Midwest violates no substantive constraint of the Fifth Amendment. Because Midwest raised no actuarial challenge to the amount of liability imposed by Central States, Midwest must pay the entire outstanding withdrawal liability, plus any accrued interest, less any interim payments made pursuant to the parties' September 24, 1996 stipulation.

Central States' motion for summary judgment is granted. Midwest's motion for summary judgment is denied.

Central States is hereby ordered to submit an affidavit and schedule of the amount due as of the date of this ruling by April 17, 1998 so that a judgment may be entered. Any

response by Midwest must be filed by April 24, 1998.

All other pending motions are denied as moot.

It is so ordered.